MIRIAM SAKOL, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4834–74. Filed March 23, 1977.

*Burton G. Lipsky,* for the petitioner.
*Peter Matwiczyk,* for the respondent.

#### OPINION

GOFFE, *Judge:* The Commissioner determined a deficiency in petitioner's Federal income tax for the taxable year 1972 in the amount of $3,318.80. Concessions having been made, the sole issue for decision is whether section 83(a)[1] is uncon-

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

stitutional because it measures petitioner's gross income derived from an employee stock purchase agreement without regard to certain contractually imposed restrictions on the transferability of the shares purchased under the agreement.

All of the facts have been stipulated and are so found. Ms. Miriam Sakol (petitioner) filed her Federal income tax return for the taxable year 1972 with the Internal Revenue Service Center, Holtsville, N.Y. At the time the petition was filed, petitioner resided in New York City, N.Y.

During 1972 petitioner was employed by Chesebrough-Pond's, Inc. (Chesebrough), which had in effect a stock purchase plan for its officers and administrative employees (the plan). Officers and employees electing to purchase stock under the plan were required to enter into a stock purchase agreement with Chesebrough. The standard agreement provided that $1 par value common stock could be purchased for an amount equal to 14 times Chesebrough's average per-share earnings during the preceding 5 years. Payment of the purchase price could be made in installments over a period not to exceed 5 years; however, the employee could prepay the balance at any time. Shares purchased under the agreement would not be issued or delivered and title to the purchased shares would not vest in the employee until the purchase price was paid in full.

On May 7, 1971, petitioner entered into such a stock purchase agreement with Chesebrough, agreeing to purchase 140 shares of $1 par value common stock at a price of $21.20 per share. For a period of 1 year, the shares purchased by petitioner were subject to forfeiture at a price equal to that paid by her in the event that she ceased to be employed by Chesebrough for any reason other than death. In addition, petitioner agreed that she would continue to own and not sell, pledge, or transfer any interest in the shares for a period of 5 years or until May 7, 1976. Chesebrough was willing to retain the shares for safekeeping until the expiration of the 5-year period, and shares delivered to petitioner would bear a legend noting the restrictions on the transferability of the shares.

On Sunday, May 7, 1972, the 140 shares acquired by petitioner were no longer subject to forfeiture. On the last business day prior to that date, the average New York Stock Exchange price quotation for Chesebrough common stock was

$66.50 per share. Therefore, the difference between the average market price of Chesebrough common and the amount paid by petitioner for her shares acquired under the stock purchase agreement was $6,342 when the shares were no longer subject to forfeiture. The Commissioner, in his statutory notice of deficiency, determined that this amount represented compensation for services, includable in petitioner's gross income pursuant to section 83(a) for the taxable year 1972.

Petitioner has launched a serious constitutional assault on section 83(a) on two fronts. On one front, petitioner contends that the section imposes a "conclusive presumption" as to the amount of income derived from the May 7, 1971, stock purchase without a fair opportunity to rebut and, therefore, amounts to a denial of due process of law within the meaning of the Fifth Amendment of the Constitution of the United States. On the other, she contends that section 83(a) disregards certain restrictions on transferability in defining income, exceeding the power granted to Congress by the 16th Amendment.

From the outset it is important to note the presumption in favor of the validity of an act of Congress, which is particularly strong in the case of a taxing statute. *Penn Mutual Indemnity Co.*, 32 T.C. 653, 658 (1959). Moreover, a revenue measure will not, in general, be set aside if any state of facts can be shown to rationally justify the provision. *United States v. Maryland Savings-Share Insurance Corp.*, 400 U.S. 4, 6 (1970).

Section 83[2] is the congressional response to certain tax advantages which could be obtained through use of restricted

---

[2] SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORM-ANCE OF SERVICES.

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture,

stock plans[3] to compensate employees. The section provides that property transferred in connection with the performance of services is to be included in the income of the transferee in an amount which exceeds the employee's cost by the fair market value of the property transferred, without regard to any contractual restriction on its disposition except a restriction which by its terms will never lapse. The proper time to include that amount is deemed to be the taxable year in which the property is transferable or no longer subject to a substantial risk of forfeiture.

To properly evaluate petitioner's attack on section 83, it is helpful to consider the background of restricted stock purchase plans and the unwarranted tax avoidance made possible by their use.

Restricted stock purchase plans became more popular after two decisions of this Court. In *Harold H. Kuchman*, 18 T.C. 154 (1952), we held that stock issued under an agreement restricting its disposition prevented the stock from having a fair market value when acquired and, therefore, did not require reporting income at the time the stock was issued. Previously, in *Robert Lehman*, 17 T.C. 652 (1951), we held that income was not realized when the restrictions terminated, thus taxation was deferred until the subsequent disposition of the property. In 1956, regulations were proposed to the effect that income would be realized in an amount equal to the fair market value of the property over the employee's cost at the time the restrictions lapsed. The regulations adopted in 1959 as section 1.421–6(d)(2), Income Tax Regs., provided, with respect to bargain purchases of stock subject to restrictions having a significant effect on value, that tax would be imposed only when the restrictions lapsed or the property was

---

whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.
\* \* \*

(c) SPECIAL RULES.—For purposes of this section—

(1) SUBSTANTIAL RISK OF FORFEITURE.—The rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual.

(2) TRANSFERABILITY OF PROPERTY.—The rights of a person in property are transferable only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture.

[3] See S. Rept. No. 91–552 (1969), 1969–3 C.B. 500.

sold in an arm's-length transaction. However, the measure of income was changed. The amount taxable as ordinary income was the lesser of the fair market value of the stock at the time of its acquisition, determined without regard to any restrictions, or at the time the restrictions lapsed, over the employee's cost of the stock.

Quite obviously, under this scheme, substantial benefits were available to an employee in a restricted stock purchase plan. Dividends were immediately available while the tax on the value of the shares was deferred and capital gains treatment was accorded the capital appreciation occurring in the period between the acquisition of the stock and the lapse of the restrictions.

In 1968 regulations were again proposed[4] which would have taxed the fair market value of the restricted stock at the time of the lapse of the restrictions, thereby eliminating the capital gain potential on the postacquisition appreciation. However, it was at this point that Congress responded with section 83, designed to reduce the potential for tax avoidance and to accord more equitable treatment to similar deferred compensation arrangements. S. Rept. No. 91–552 (1969), 1969–3 C.B. 500, is clear in this regard:

> *General reasons for change.*—The present law treatment of restricted stock plans is significantly more generous than the treatment specifically provided in the law for other types of similarly funded deferred compensation arrangements. An example of this disparity can be seen by comparing the situation where stock is placed in a nonexempt employees' trust rather than given directly to the employee subject to restrictions. If an employer transfers stock to a trust for an employee and the trust provides that the employee will receive the stock at the end of 5 years if he is alive at that time, the employee is treated as receiving and is taxed on the value of the stock at the time of the transfer. However, if the employer, instead of contributing the stock to the trust, gives the stock directly to the employee subject to the restriction that it cannot be sold for 5 years, then the employee's tax is deferred until the end of the 5-year period. In the latter situation, the employee actually possesses the stock, can vote it, and receives the dividends, yet his tax is deferred. In the case of the trust, he may have none of these benefits, yet he is taxed at the time the stock is transferred to the trust.

Congress resolved to alter the timing of the recognition of income derived from such stock purchase agreements. Income would be recognized at such time as the shares were either

---

[4] Sec. 1.421–6, Income Tax Regs., 33 Fed. Reg. 15870 (1968).

transferable, as defined in the statute, or when they were no longer subject to a substantial risk of forfeiture.

In addition, to minimize the potential for continued tax avoidance and to further discourage the use of restricted stock purchase plans as a means of obtaining an equity interest in one's employer, Congress decided to measure the income derived from such arrangements without regard to transitory restrictions imposed by the parties on the shares purchased.

Petitioner maintains that section 83, in disregarding contractual restrictions, imposes a tax on an amount which has not been realized and, therefore, is not income within the purview of the 16th Amendment.

In support of this contention, petitioner relies on language extracted from two early cases, *MacLaughlin v. Alliance Ins. Co.,* 286 U.S. 244 (1932), and *Eisner v. Macomber,* 252 U.S. 189 (1920). However, in our view petitioner has placed too much reliance on these cases and the Supreme Court's long-abandoned effort to fashion a concept of income. The powers granted to the Congress to define income are broad and plenary. *Penn Mutual Indemnity Co.,* 32 T.C. 653, 666 (1959). The formalistic concept of realization articulated in the cases upon which petitioner relies has been eroded by the passage of time and subsequent cases and clearly was never intended to define for all times the parameters of income subject to taxation. *Commissioner v. Glenshaw Glass Co.,* 348 U.S. 426 (1955); *Helvering v. Horst,* 311 U.S. 112 (1940); *Helvering v. Bruun,* 309 U.S. 461 (1940). Moreover, taxation despite nonreceipt is common and the actual reduction to possession is not a constitutional requirement. See, e.g., *Harrison v. Schaffner,* 312 U.S. 579 (1941); *Helvering v. Horst, supra; Lucas v. Earl,* 281 U.S. 111 (1930).

In any event, the 16th Amendment is not a limitation on the taxing power granted to Congress by the Constitution. It is, instead, designed to insure that the power to tax income is not placed into the category of direct taxation subject to apportionment. It is clear that section 83 does not impose a direct tax within the meaning of the Constitution and, therefore, is entirely within the taxing power of Congress under article 1, section 8, without regard to the 16th Amendment. Cf. *Spreckels Sugar Refining Co. v. McClain,* 192 U.S. 397 (1904). See also *Penn Mutual Indemnity Co., supra* at

662–663. Accordingly, we hold that section 83 does not exceed the congressional authority to tax income.

Although an amount may properly be viewed as income within the meaning of the Constitution, the question remains whether the imposition of a tax on that amount is consonant with due process under the Fifth Amendment. *Riverfront Groves, Inc.*, 60 T.C. 435 (1973).

Herein, petitioner takes the position that her income may not exceed the fair market value of the restricted stock she received under the agreement. She argues that section 83, in its conclusive measurement of income without regard to the restrictions on the transferability of her shares, is so arbitrary and unreasonable as to amount to a denial of due process within the meaning of the Fifth Amendment.

On its face, section 83 does not utilize the language of presumptions; it merely defines income earned when property is received "in connection with the performance of services." However, the substance and impact of the section is substantially the same as a conclusive presumption of the amount of income. In recent years, a considerable body of law has developed with regard to conclusive presumptions and the due process clause of the Fifth Amendment. See, e.g., *Cleveland Board of Education v. LaFleur,* 414 U.S. 632 (1974); *Vlandis v. Kline,* 412 U.S. 441 (1973); *U.S. Dept. of Agriculture v. Murry,* 413 U.S. 508 (1973). Much of the analysis applied in these cases can be traced to *Heiner v. Donnan,* 285 U.S. 312 (1932), and *Schlesinger v. Wisconsin,* 270 U.S. 230 (1926), upon which petitioner relies herein.

In *Donnan,*[5] an estate tax case, the Court found unconstitutional under the due process clause section 302(c) of the Revenue Act of 1926 which deemed any transfer made by a decedent within 2 years of death to have been made in contemplation of death and, therefore, includable in the decedent's gross estate for tax purposes. The Court reasoned that the statute operated arbitrarily by not allowing the estate's executor any opportunity to establish that the gifts were not, in fact, made in contemplation of death. Moreover,

---

[5] The issue and reasoning in *Schlesinger v. Wisconsin,* 270 U.S. 230 (1926), is substantially the same, dealing, however, with a section of the Wisconsin tax code. In addition, petitioner has on brief argued that we approved the theory of *Heiner v. Donnan,* 285 U.S. 312 (1932), in *Charles Wilson,* 39 T.C. 362 (1962). However, we did not pass upon the constitutional issue presented there and, therefore, find it unpersuasive.

the result was further justified by the fact that the estate was burdened by a tax measured in part by the value of property which was never owned by the estate.

More recently in *Vlandis v. Kline, supra,* the Court found unconstitutional a Connecticut statute which classified prospective students as permanent nonresidents for purposes of tuition payment in the State university when their legal address was outside the State at the time their application for admission was made or at some point during the preceding year. Seemingly, the Court was primarily concerned with whether the individuals were accurately grouped and it stated:

We hold only that a permanent irrebuttable presumption of nonresidence—the means adopted by Connecticut to preserve that legitimate interest—is violative of the Due Process Clause, because it provides no opportunity for students who applied from out of State to demonstrate that they have become bona fide Connecticut residents. * * * [*Vlandis v. Kline,* 412 U.S. at 453.]

The standard employed was meticulous; the due process clause would be violated if the conclusive presumption were not necessarily and universally true in fact. The remedy afforded was to ascertain whether the treatment of the individual was consistent with the statute's purpose.

Justice Rehnquist, in his dissent, argued that the majority's analysis of and its reliance on *Donnan* were reminiscent of and inexorably linked to the long-repudiated principles of "substantive due process" and contrary to the teaching of *Ferguson v. Skrupa,* 372 U.S. 726 (1963), which held that courts should not substitute their social and economic beliefs for those of the elected legislative bodies.

From a close examination of the conclusive presumption cases, it is apparent that the concern with the statutory accuracy of what is, in essence, a delineation of a class of persons who are to bear a burden or receive a benefit under prescribed circumstances closely resembles the analysis applied in equal protection cases.

Finally, in *Weinberger v. Salfi,* 422 U.S. 749 (1975), Justice Rehnquist, writing for the majority, noted that various holdings in similar cases dealing with irrebuttable presumptions did not "sound precisely the same note" and, therefore, discussed at some length the proper test to be applied in cases

of this sort. Returning to a more traditional equal protection analysis, the Court stated:

The question is whether Congress, its concern having been reasonably aroused by the possibility of an abuse which it legitimately desired to avoid, could rationally have concluded both that a particular limitation or qualification would protect against its occurrence, and that the expense and other difficulties of individual determinations justified the inherent imprecision of a prophylactic rule. * * * [422 U.S. at 777.]

The Court also quoted with approval from *Richardson v. Belcher*, 404 U.S. 78 (1971), where it was held that an act of Congress will not be so arbitrary as to offend due process where the legislative classification is rationally related to the achievement of legitimate legislative goals. Moreover, a legislative enactment need not be in every respect logically consistent with those goals to be constitutional. *Williamson v. Lee Optical Co.*, 348 U.S. 483, 487 (1955).

It is also important to consider that in neither *Donnan* nor *Vlandis* was the Court confronted with the same kind of clear constitutional power which is granted to Congress to define income subject to taxation. The salient distinction in *Donnan* is the fact that the taxpayer's estate never owned the property, while petitioner herein is merely charged in advance with an incremental value which in some sense is inherent in the property and in all probability the real measure of the compensation intended by the parties. Moreover, the tax consequences were clearly delineated in the Chesebrough stock purchase plan and presumably petitioner was aware of the measure of her compensation.

Prior to enactment of section 83, contractual restrictions were utilized to maximize both tax deferral and capital gain potential on the ultimate disposition of the shares. Cognizant of such abuse, Congress chose to recognize only those restrictions which it felt were not utilized to produce such unwarranted tax benefits.

· H. Rept. No. 91–413 (1969), 1969–3 C.B. 255, states:

*Explanation of provision.*—For the above reasons, your committee's bill provides that a person who receives a beneficial interest in property by reason of the performance of services is to be taxed with respect to the property at the time of receipt, either if his interest in the property is transferable or if it is not subject to a substantial risk of forfeiture. In this case, the person is to be required to include in income the amount by which the fair market value of the property exceeds the amount (if any) he paid

for the property. For this purpose, the fair market value of the property is to be determined without regard to any restriction, except a restriction which by its terms will never lapse. Restrictions which by their terms never lapse, for example, a requirement that an employee sell the stock back to the employer * * * *are not, in your committee's opinion, tax-motivated and should be distinguished from restrictions designed to achieve deferral for tax saving purposes.* [Emphasis added.]

Undoubtedly, the efficacy of the congressional design to eliminate the dual benefits of tax deferral and capital gain would have been dangerously undermined without a strict measure of the income resulting from such agreements. There can be no doubt that Congress may adopt a measure calculated to prevent an avoidance of tax. *Helvering v. City Bank,* 296 U.S. 85, 90 (1935). The plethora of contractual restrictions which could be designed would create substantial problems of valuation—an alternative Congress may seek to avoid. *Helvering v. Lerner Stores Co.,* 314 U.S. 463, 468 (1941). Moreover, the recognition of contractual restrictions would build into every share of stock a deferral and potential capital gain increment, albeit on a smaller scale, resulting from the immediate imposition of tax under the proscribed statutory conditions.

Traditionally, to invalidate a taxing statute, it must be shown that Congress did a wholly arbitrary thing or found equivalence where there was none or anything approaching it. *United States v. Manufacturers National Bank,* 363 U.S. 194 (1960); *Burnet v. Wells,* 289 U.S. 670 (1933).

As respondent points out, there are other examples of conclusive presumptions in the tax code. The Civil Service Retirement Act is a prime example wherein the employee is presumed to have consented to payroll deductions for contributions to a retirement plan while taxed currently on those amounts. A tax on the full amount has been sustained in *Hogan v. United States,* 513 F.2d 170 (6th Cir. 1975), and *Lawrence J. Cohen,* 63 T.C. 267 (1974), although based primarily on the facts and not the constitutional validity of a tax on amounts arguably in excess of the current economic benefit. However, the continued use of conclusive presumptions as a statutory technique in taxing statutes lends credibility to the notion that their use in this regard is not arbitrary or unreasonable.

We are unable to say that Congress, in responding to an area of tax avoidance created by the use of such restrictions which it now refuses to recognize, acted arbitrarily. While some unfairness and inequity may result from the operation of section 83, Congress could rationally have concluded that such a result was justified by the ease and certainty of the section's operation. *Weinberger v. Salfi,* 422 U.S. at 777. We are convinced, moreover, that section 83 is a rational response to an area of substantial tax abuse. *Moritz v. Commissioner,* 469 F.2d 466 (10th Cir. 1972), cert. denied 412 U.S. 906 (1973).

We conclude that section 83 is a valid exercise of the taxing power and consonant with the principles established in *Weinberger* and *Burnet.* In any event, the question is clearly not so free from doubt so as to rebut the real and vital presumption in favor of the validity of a taxing statute. *Penn Mutual Indemnity Co.,* 32 T.C. 653 (1959). Accordingly, we hold that section 83 is constitutional.

*Decision will be entered under Rule 155.*