THOMAS R. PLEDGER AND PHYLLIS R. PLEDGER, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FAUSTO A. FUENTES AND MARY JANE FUENTES, PETITIONERS
*v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10855–75, 6532–76,     Filed January 23, 1979.
6533–76, 6557–76.

*Robert O. Rogers* and *David S. Meisel,* for the petitioners.
*Michael W. Ford,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in the Federal income tax of petitioners as follows:

| Petitioners | Docket No. | Taxable year | Deficiency | Addition to tax sec. 6651(a) |
|---|---|---|---|---|
| Thomas R. and Phyllis R. Pledger | 10855–75 | 1970 | $13,042.03 | 0 |
| | | 1971 | 155,416.27 | 0 |
| | 6532–76 | 1973 | 265,024.80 | 0 |
| Fausto A. and Mary Jane Fuentes | 6533–76 | 1968 | 1,990.20 | $497.55 |
| | | 1969 | 2,039.73 | 509.93 |
| | | 1970 | 3,982.75 | 995.69 |
| | 6557–76 | 1972 | 236,084.83 | 0 |
| | | 1974 | 183,986.91 | 0 |

Respondent has conceded that petitioners Fuentes are not liable for any deficiency in income tax or addition to tax for the taxable years 1968, 1969, and 1970 set forth above (docket No. 6533–76).

Upon a joint oral motion of the parties, these cases were consolidated for trial, briefs, and opinion.

The issues for our decision with respect to petitioners Pledger are:

(1) Whether the term "restriction" used in section 83(a)(1), I.R.C. 1954,[1] applies to restrictions imposed by law or only to contractual restrictions imposed by parties to a stock option agreement; and

(2) Whether section 83 violates the 5th and 16th Amendments to the Constitution of the United States.

The issues for our decision with respect to petitioners Fuentes are:

(1) Whether the term "restriction" used in section 1.421–6(d)(2)(i), Income Tax Regs., applies to restrictions imposed by

---

[1] All section references are to the Internal Revenue Code of 1954, as amended.

law or only to contractual restrictions imposed by parties in a stock option agreement; .

(2) Whether the provisions of section 1.421–6, Income Tax Regs., apply to a United States citizen residing in Puerto Rico at the time he exercises a stock option but then becomes a United States resident and sells stock received pursuant to the exercise of his option; and

(3) Whether a restriction having a significant effect on the value of stock acquired by petitioner pursuant to a stock option agreement lapsed on March 6, 1974.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are accordingly incorporated by this reference.

Thomas R. Pledger and his wife Phyllis R. Pledger resided at North Palm Beach, Fla., at the time they filed their petitions in the instant case. For the taxable years 1971 and 1973 they filed joint Federal income tax returns with the Internal Revenue Service Center at Chamblee, Ga. Mrs. Pledger is a party to this proceeding simply because of her filing a joint return with her husband Thomas R. Pledger, who will be referred to herein as Pledger.

Pledger had been employed as an executive of Burnup & Sims, Inc. (Burnup & Sims), for several years prior to 1970. Burnup & Sims had its principal office in West Palm Beach, Fla., and was engaged in the business of designing, constructing, and maintaining facilities for telephone, CATV, and electric utilities. From 1968 to 1970, Mr. Riley V. Sims was chairman of the board, president, and chief executive of Burnup & Sims. On July 15, 1970, Mr. Sims granted to Pledger an option to acquire 10,000 shares of Burnup & Sims owned by Mr. Sims for $20 per share.[2] With the passage of time, the number of shares subject to the option increased to 30,000 shares due to stock splits and dividends. Correspondingly, the cost per share decreased to $6.67 per share.

On October 21, 1971, Pledger exercised his option and acquired 6,000 shares of Burnup & Sims for a purchase price of $40,000.

---

[2]Mr. Sims owned a substantial number of outstanding shares of Burnup & Sims.

On November 24, 1971, Pledger acquired the remaining 24,000 shares for a purchase price of $160,000. The mean between the bid and asked price of the stock, which was traded over the counter was $22.25 and $20.87, respectively, on the dates Pledger acquired the stock. Pledger received the stock in connection with his performing services for Burnup & Sims.

The Burnup & Sims stock acquired by Pledger pursuant to the option agreement was not subject to a substantial risk of forfeiture and was not subject to a restriction which by its terms would never lapse. However, contemporaneous with his acquisition Pledger executed and delivered a letter to Mr. Sims which provided:

The undersigned, Thomas R. Pledger, hereby represents and warrants to Riley V. Sims and to Burnup & Sims, Inc., a Delaware corporation ("Burnup & Sims"), that the 30,000 shares of Common Stock, par value $.10 per share, of Burnup & Sims (the "Shares") to be received by such undersigned on the date hereof from Mr. Sims are being acquired by the undersigned for the undersigned's own account for investment and not with a view to the sale, distribution or other disposition thereof and the undersigned represents and warrants that such shares shall not be sold, transferred or otherwise disposed of in violation of the Securities Act of 1933, as amended, or the General Rules and Regulations promulgated thereunder by the Securities and Exchange Commission (the "Act"). * * * The undersigned understands that all certificates representing the Shares shall be stamped or otherwise imprinted with a legend in substantially the following form:

The shares represented by this certificate have not been registered under the Securities Act of 1933, as amended. The shares shall not be sold or transferred in the absence of an effective registration statement for the shares under the Securities Act of 1933, as amended, or an opinion of counsel to the Company prior to the proposed transaction that registration is not required under said Act.

In conjunction with this letter, Pledger received stock certificates which contained the following legend:

The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be sold or transferred in the absence of an effective registration statement for the shares under the Securities Act of 1933, a so-called "no action letter" from the Securities and Exchange Commission stating that the Commission's staff will recommend that no action be taken by the Commission if the proposed transfer or disposition is effected as proposed, or an opinion of the corporation's counsel to the effect that registration is not required under said Act.

Pledger could have sold these shares pursuant to another

private placement and the rights of a purchaser would not have been subject to a substantial risk of forfeiture. However, if Pledger had made such a sale the shares would have been subject to a discount of 35 percent from the fair market value of Burnup & Sims stock traded over the counter. The discount was due to the restrictions imposed by Pledger's investment letter representations.

On their joint Federal income tax return for the taxable year 1971 the Pledgers reported $195,363 as income described as "compensation factor of non-qualified stock option." They calculated the amount of compensation as follows:

Value of stock on dates of exercise
 (per appraisals) ................................................ $395,363
Amount paid for stock on dates of exercise .......... 200,000
Amount determined to be compensation
 (excess of value over amount paid) .................... 195,363

The Commissioner, in his statutory notice of deficiency, determined that Pledger had taxable income in the year he exercised his option (1971) to the extent the fair market value of the stock exceeded the cost per share. Accordingly, the Commissioner increased Pledgers' taxable income in the amount of $239,137. He determined this amount as follows:

| Date | No. of shares | Unit price | Total cost |
|---|---|---|---|
| 10/27/71 | 6,000 | $6.67 | $40,000 |
| 11/24/71 | 24,000 | 6.67 | 160,000 |
| Totals | 30,000 | | 200,000 |

| | | | |
|---|---|---|---|
| Date of exercise ............................. | 10/27/71 | | 11/24/71 |
| Bid price ...................................... | $22 | | $20⅝ |
| Asked price ................................... | 22½ | | 21⅛ |
| Mean ........................................... | 22¼ | | 20⅞ |
| Value (6,000 x $22¼) ...................... | 133,500 | | |
| (24,000 x 20⅞) ............................ | | | 501,000 |
| Cost, as above .............................. | 40,000 | | 160,000 |
| Ordinary income, taxable upon exercise ...................................... | 93,500 | | 341,000 |
| Combined ..................................... | (93,500) | | 93,500 |
| Total for year ............................... | | | 434,500 |
| Amount reported on 1971 Form 1040 ............................ | | | 195,363 |
| Increase to ordinary income ........................ | | | 239,137 |

Pursuant to this determination the Commissioner adjusted Pledger's basis in the stock so as to reflect the increase in

compensation as determined. The taxable year 1973 with respect to Pledger is at issue solely for the purpose of computing the basis of the stock he sold during 1973 and the resulting gain. Pledgers' taxable year 1970 is not at issue due to agreement of the parties.

Fausto A. Fuentes and his wife Mary Jane Fuentes resided at Miami, Fla., at the time they filed their petitions in the instant case. For the taxable years 1972 and 1974 they filed joint Federal income tax returns with the Internal Revenue Service Center at Chamblee, Ga. Mrs. Fuentes is a party to this proceeding simply because of her filing a joint return with her husband Fausto A. Fuentes who will be referred to herein as Fuentes.

Fuentes was an employee of Burnup & Sims for a number of years and during 1965 through 1968 he was a member of the board of directors of Burnup & Sims. During 1960 Fuentes became vice president of Call, Burnup & Sims, Inc., of Puerto Rico which is a subsidiary of Burnup & Sims. Upon his becoming vice president, Fuentes moved to Puerto Rico. He retired at age 59 on February 20, 1972, and returned to the United States as a permanent resident on April 20, 1972.

On November 30, 1968, Mr. Sims granted to Fuentes a 5-year option to purchase 3,500 shares of Burnup & Sims stock which Mr. Sims owned, at a price of $8.375 per share, or a total price of $29,312.50. The purpose of granting the option was to compensate Fuentes for services performed and to be performed in Puerto Rico. The option was not transferable and had no readily ascertainable fair market value on the date Mr. Sims granted it. Burnup & Sims stock split during 1970 and 1971 and when Fuentes exercised his option on February 11, 1972, he purchased 15,750 shares for a price of $29,312.50. The mean between the bid and asked prices of Burnup & Sims stock traded over the counter was $32.50 on February 11, 1972.

In connection with the exercise of his option, Fuentes executed and delivered to Mr. Sims a letter regarding the ownerhip and disposition of the stock received by Fuentes. The letter contained the following declaration:

The undersigned, Fausto A. Fuentes, hereby represents and warrants to Riley V. Sims and to Burnup & Sims Inc., a Delaware corporation ("Burnup & Sims"), that the 15,750 shares of Common Stock, par value $.10 per share, of Burnup & Sims (the "Shares") to be received by such undersigned on the date

hereof from Mr. Sims are being acquired by the undersigned for the undersigned's own account for investment and not with a view to the sale, distribution or other disposition thereof and the undersigned represents and warrants that such shares shall not be sold, transferred or otherwise disposed of in violation of the Securities Act of 1933, as amended, or the General Rules and Regulations promulgated thereunder by the Securities and Exchange Commission (the "Act"). The undersigned confirms his understanding that the Shares have not been registered under the Act and, except for sales made in reliance upon Rule 144 under the Act, must be held indefinitely unless the Shares are registered under such Act or an exemption from such registration is available. The undersigned further confirms his understanding that any sales made by him in reliance upon Rule 144 can only be made in limited amounts in accordance with the terms and conditions of such Rule.

The undersigned agrees that prior to any transfer or disposition of any Restricted Securities (as hereafter defined), the undersigned will give written notice to Burnup & Sims expressing such holder's intention to effect such transfer or disposition and describing briefly the proposed transfer or disposition. Such notice shall be accompanied by an opinion of counsel for the undersigned as to the status of the proposed transfer under the Act. Promptly upon receiving such notice Burnup & Sims shall present copies thereof to its counsel and the following provisions shall apply:

1. If in the opinion of Burnup & Sims' counsel the proposed transfer or disposition of such Restricted Securities may be effected without registration of such Restricted Securities under the Act, Burnup & Sims shall promptly thereafter notify the undersigned, whereupon the undersigned shall be entitled to transfer such Restricted Securities, all in accordance with the terms of the notice delivered by the undersigned to Burnup & Sims.

Following his exercise of the option, Fuentes received stock certificates which contained a legend as follows:

The shares represented by this certificate have not been registered under the Securities Act of 1933. The shares have been acquired for investment and may not be sold or transferred in the absence of an effective registration statement for the shares under the Securities Act of 1933, a so-called "no action letter" from the Securities Exchange Commission stating that the Commission's staff will recommend that no action be taken by the Commission if the proposed transfer or disposition is effected as proposed, or an opinion of the corporation's counsel to the effect that registration is not required under said Act.

Fuentes could have sold the shares immediately following his exercise of the option by way of another private placement. Had he done so the shares would have been subject to a discount of 35 percent from the fair market value of Burnup & Sims stock traded over the counter.

On June 2, 1972, Burnup & Sims declared a 100-percent stock dividend and as a result Fuentes held 31,500 shares. Fuentes

continued to hold the stock he acquired on February 11, 1972, but on March 6 and March 11, 1974, he sold 7,000 and 8,000 shares of Burnup & Sims stock, respectively, for a price of $20.08 per share. On the dates of the two sales, the mean between the bid and asked prices of the stock traded over the counter were $20.75 and $22.375, respectively. On March 6, 1974, the following circumstances existed with respect to the stock acquired by Fuentes under the option:

(1) The shares had been owned and paid for by Fuentes for a period of 2 years or more;

(2) The shares did not exceed 1 percent of the outstanding common stock of Burnup & Sims;

(3) There was adequate information available to the public in regard to Burnup & Sims since it was in compliance with all reporting requirements of the Securities and Exchange Commission;

(4) The shares could have been sold in a broker's transaction; and

(5) If the shares were sold, a notice of such sale could have been filed concurrently with the Securities and Exchange Commission.

For the above reasons, Fuentes could have given the required notice to Burnup & Sims and obtained from its counsel an opinion that the shares could be sold without their registration with the Securities and Exchange Commission.

On their joint Federal income tax return for 1974, the Fuentes reported the sale of stock as follows:

| Number of shares | Date acquired | Date sold | Gross sales price | Cost | Gain |
|---|---|---|---|---|---|
| 7,000 | 2/22/72 | 3/6/74 | $140,589.65 | $7,000 | $133,589.65 |
| 8,000 | 2/22/72 | 3/11/74 | 160,613.00 | 8,000 | 152,613.00 |
| Net long term gain | | | | | 286,202.65 |
| Less: (sec. 1202 deduction) | | | | | 143,101.33 |
| Income reported | | | | | 143,101.32 |

The Commissioner, in his statutory notice of deficiency, determined that Fuentes realized income in the amount of $482,562.50 in either the taxable year 1972 or 1974, arising from the stock option granted by Mr. Sims. Respondent now asserts

that Fuentes realized this amount in the year 1974, rather than his alternative position relating to Fuentes' taxable year 1972.[3] In arriving at the amount of income ($482,562.50), the Commissioner determined that Fuentes received stock subject to restrictions which substantially affected its value at the time he exercised his option. He further determined these restrictions lapsed on March 6, 1974, and at that time Fuentes realized income to the extent that the fair market value of the acquired stock, as of February 11, 1972 (determined without regard to the restrictions), exceeded the amount Fuentes paid for the stock ($29,312.50). In addition, the Commissioner determined that "Riley V. Sims granted you this option to compensate you for services rendered and to be rendered to Burnup and Sims, Inc. within the United States and not apportionable to services rendered or to be rendered within and without the United States."

## OPINION

### Petitioners Pledger

The first issue for our decision is whether the term "restriction" as used in section 83(a)(1) applies to restrictions imposed by law or only to contractual restrictions imposed by parties to a stock option agreement.

During 1971, Pledger acquired 30,000 shares of Burnup & Sims stock pursuant to an option given to him in 1970 as compensation for services.[4] The stock he received, upon the exercise of his option, carried with it certain restrictions, as set forth in the findings of fact. These restrictions reduced the value of the stock by 35 percent of the amount he would have received from the sale of registered stock traded on the open market.[5]

On their joint Federal income tax return for the taxable year 1971, Pledger and his wife reported income from the exercise of the option in the amount of $195,363. They arrived at this

---

[3]Respondent conceded at trial that no taxable event occurred during the taxable year 1972 with respect to Fuentes' exercise of his stock option.

[4]The option granted to Pledger the right to acquire 10,000 shares of Burnup & Sims stock at $20 per share. Through stock splits and dividends, the number of shares subject to the option increased to 30,000 shares and the cost per share decreased to $6.67 as of the date Pledger exercised the option.

[5]On the dates of Pledger's acquisition, Oct. 21 and Nov. 24, 1971, the mean between the bid and asked prices of Burnup & Sims registered stock was $22.25 and $20.875, respectively (per share).

amount by calculating the excess of the fair market value of the stock received over the amount paid for the stock.

Respondent takes the position that the amount of income realized from the exercise of the option is the excess of the fair market value of the stock over the amount paid for the stock without regard to the restrictions imposed on the stock which affected its value. His position is based upon the application of section 83 which provides in part:

(a) GENERAL RULE.—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

Pledger first contends that section 83 is unconstitutional because it imposes a tax on an amount (the excess of the fair market value over the amount paid) which is not realized income and, therefore, results in the application of an indirect tax which is not uniform. We do not agree. In *Sakol v. Commissioner*, 67 T.C. 986 (1977), affd. 574 F.2d 694 (2d Cir. 1978), cert. denied 439 U.S. (1978), we held that the application of section 83 was entirely within the taxing power of Congress to tax income. We further held that the excess of the fair market value over the amount paid for the stock constituted income irrespective of receipt or nonreceipt. We stated at page 991:

The formalistic concept of realization articulated in the cases upon which petitioner relies [and upon which Pledger relies, i.e., *Eisner v. Macomber*, 252 U.S. 189 (1920)] has been eroded by the passage of time and subsequent cases and clearly was never intended to define for all times the parameters of income subject to taxation. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426 (1955); *Helvering v. Horst*, 311 U.S. 112 (1940); *Helvering v. Bruin*, 309 U.S. 461 (1940). Moreover, taxation despite nonreceipt is common and the actual reduction to possession is not a constitutional requirement. See, e.g., *Harrison v. Schaffner*,

312 U.S. 579 (1941); *Helvering v. Horst, supra; Lucas v. Earl,* 281 U.S. 111 (1930).

Pledger next argues that the application of section 83 violates the Fifth Amendment of the Constitution of the United States because it imposes a tax on a presumption of fact which he cannot controvert and is so arbitrary and unreasonable that it violates due process.[6] This argument is identical to that raised by taxpayer in *Sakol v. Commissioner, supra,* wherein we held that section 83 is constitutional. For the same reasons, as set forth in *Sakol,* we cannot agree with Pledger's argument.

Pledger finally contends that the term "restriction" in section 83 applies only to restrictions which are imposed by contractual agreement. By contrast, Pledger argues that the restrictions on his stock were imposed by the application of law and, therefore, in applying section 83 the calculation of the fair market value of the stock he received during 1971 must be determined *with* regard to the restrictions (i.e., the 35-percent discount factor).

Respondent counters by arguing that the language of section 83 ("determined without regard to any restriction") is clear and plain and, therefore, section 83 encompasses restrictions imposed by law as well as those imposed by contractual agreement. He relies upon the proposition set forth in *Prudential Insurance Co. of America v. United States,* 319 F.2d 161 (Ct. Cl. 1963), wherein the Court stated:

> It is fundamental that an unambiguous statute should be given effect according to its plain and obvious meaning, Bate Refrigerating Co. v. Sulzberger, 157 U.S. 1, 36–37, 15 S.Ct. 508, 39 L.Ed. 601 (1895); Christner v. Poudre Valley Cooperative Ass'n, 235 F.2d 946, 950 (10th Cir., 1956). This principle is as applicable to a revenue statute as it is to any other type of legislation. Crane v. Commissioner, 331 U.S. 1, 6, 67 S.Ct. 1047, 91 L.Ed. 1301 (1947). [319 F.2d at 166.]

Accordingly, respondent contends that the word "any" does not limit the type of restrictions contemplated by section 83. In addition, respondent argues that judicial precedent and application of income tax regulations, which were in effect prior to the enactment of section 83, clearly demonstrate that restrictions imposed by law are included in the purview of section 83. We agree.

---

[6] Presumably, Pledger's position is that the conclusive measurement of income without regard to the restrictions imposed, which affect the value of the stock, is arbitrary and unreasonable.

As respondent points out, prior to the enactment of section 83 the taxation of restricted stock received as compensation for services was governed by sections 1.61–2(d)(5) and 1.421–6(d)(2), Income Tax Regs. In this context, section 1.421–6(d)(2), Income Tax Regs., provided that if an employee received property pursuant to an option not covered by statute, which was subject to restrictions that substantially affected its value, the employee realized compensation when the restriction lapsed or the property was sold in an arm's-length transaction whichever occurred first. In *Hirsch v. Commissioner*, 51 T.C. 121 (1968), we held that Federal securities law was included in the term restrictions which affected the value of property received by an employee. In the following year, 1969, Congress enacted section 83 to end tax avoidance schemes. See *Sakol v. Commissioner*, *supra* at 988–995. In an explanation of the purpose of section 83, H. Rept. 91–413 (1969), 1969–3 C.B. 255, states:

For the above reasons your committee's bill provides that a person who receives a beneficial interest in property by reason of the performance of services is to be taxed with respect to the property at the time of receipt, either if his interest in the property is transferable or if it is not subject to a substantial risk of forfeiture. In this case the person is to be required to include in income the amount by which the fair market value of the property exceeds the amount (if any) he paid for the property. *For this purpose, the fair market value of the property is to be determined without regard to any restriction, except a restriction which by its terms will never lapse.* Restrictions which by their terms never lapse, for example, a requirement that an employee sell the stock back to the employer at book value or a formula price if he terminates his employment, are not, in your committee's opinion, tax motivated and should be distinguished from restrictions designed to achieve deferral for tax saving purposes. [Emphasis added.]

Making restrictions imposed by law an exception to the application of section 83(a)(1) would clearly thwart congressional intent and result in transactions which Congress intended to eliminate, i.e., tax avoidance. Cf. *Bayley v. Commissioner*, 69 T.C. 234, 245 (1977). While some unfairness and inequity may result from the operation of section 83, Congress could rationally have concluded that such a result was justified by the ease and certainty of the section's operation. *Sakol v. Commissioner*, *supra* at 996. Therefore, we sustain respondent's determination.

### Petitioners Fuentes

In 1960, Fuentes was employed by Burnup & Sims and moved

to Puerto Rico where he became vice president of Call, Burnup & Sims, Inc., of Puerto Rico.[7] He was a resident of Puerto Rico until April 1972 at which time he returned to the United States and established residency. On November 30, 1968, Mr. Riley Sims, chairman of the board of Burnup & Sims, granted a 5-year stock option to Fuentes whereby Fuentes had the right to purchase 3,500 shares of Burnup & Sims stock for $8.375 per share or a total purchase price of $29,312.50. The 5-year option was nontransferable and, therefore, had no readily ascertainable market value. On February 11, 1972, Fuentes exercised his option and purchased 15,750 shares of Burnup & Sims stock.[8] On this date, the mean between the bid and asked price of the stock traded over the counter was $32.50.

Fuentes received the stock pursuant to a private placement which restricted its sale and thus substantially affected the value of the stock. He could have sold his stock immediately after he exercised his option but in doing so would have had to discount the value of the stock by 35 percent due to the restrictions.

On February 20, 1972, Fuentes retired at the age of 59 and on April 20, 1972, he returned to the United States and became a resident. Following his return, Burnup & Sims declared a 100-percent stock dividend on June 2, 1972, after which Fuentes held 31,500 shares of stock.

On February 11, 1974, 2 years after Fuentes exercised his option, circumstances (as set forth in detail in our findings of fact) existed whereby he could have sold his stock without registration with the Securities and Exchange Commission. On March 6 and 11, 1974, Fuentes sold 7,000 and 8,000 shares, respectively, for $20.80 per share. On those respective dates, the mean between the bid and asking price of Burnup & Sims stock traded over the counter was $20.75 and $22.375.

Petitioner Fuentes contends that because the stock options were received and exercised while he was a bona fide resident of Puerto Rico he should not be taxed for compensation when he sold shares of the stock in 1974 or taxable at any other time, relying on section 933 of the Code. In the statutory notice, the Commissioner determined that Mr. Sims granted the stock

---

[7] This corporation was a subsidiary of Burnup & Sims.

[8] The increase in the number of shares received was due to stock splits which occurred in 1970 and 1971. The purchase price, however, remained the same; i.e., $29,312.50.

option to Fuentes in 1968 to compensate him for services rendered and to be rendered in the United States and not apportionable to services rendered or to be rendered within and without the United States. Of course, the statutory notice is presumptively correct but respondent never argued on brief that the determination of purpose for granting the option contained in the statutory notice was correct. Nevertheless, based upon the record, we hold that petitioners Fuentes have sustained their burden of proving that this portion of the Commissioner's determination is erroneous. We, accordingly, found as a fact that Sims' purpose in granting the option to Fuentes in 1968 was to compensate him for services performed and to be performed in Puerto Rico. Fuentes was vice president of the corporate subsidiary since 1960 when he became a resident of Puerto Rico and he held that position until February 20, 1972, when he retired and then returned to the United States 2 months later. Fuentes' testimony amply demonstrates that the services he performed from 1960 to 1972 were on behalf of the subsidiary in Puerto Rico.

Section 933 of the Code provides as follows:

The following items shall not be included in gross income and shall be exempt from taxation under this subtitle:

(1) RESIDENT OF PUERTO RICO FOR ENTIRE TAXABLE YEAR.—In the case of an individual who is a bona fide resident of Puerto Rico during the entire taxable year, income derived from sources within Puerto Rico (except amounts received for services performed as an employee of the United States or any agency thereof); but such individual shall not be allowed as a deduction from his gross income any deductions (other than the deduction under section 151, relating to personal exemptions) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

(2) TAXABLE YEAR OR CHANGE OF RESIDENCE FROM PUERTO RICO.—In the case of an individual citizen of the United States who has been a bona fide resident of Puerto Rico for a period of at least 2 years before the date on which he changes his residence from Puerto Rico, income derived from sources therein (except amounts received for services performed as an employee of the United States or any agency thereof) which is attributable to that part of such period of Puerto Rican residence before such date; but such individual shall not be allowed as a deduction from his gross income any deductions (other than the deduction for personal exemptions under section 151) properly allocable to or chargeable against amounts excluded from gross income under this paragraph.

Because petitioners Fuentes returned to the United States to become residents on April 20, 1972, section 933(2) would be

applicable to them. At the time of their return to the United States the Fuentes had been bona fide residents of Puerto Rico for 12 years. When Fuentes received the stock option in 1968, had he received compensation in the form of cash or property having an ascertainable fair market value, such compensation would have been excludable from United States income under section 933(1). Likewise, if on February 11, 1972, when Fuentes exercised the stock option granted to him in 1968, had he received compensation in the form of cash or property having an ascertainable fair market value, such compensation would have been excludable from United States income under section 933(2). Now, should the result be different because Fuentes instead received compensation in the form of a stock option in 1968 which he exercised in 1972 before terminating his residency in Puerto Rico? We think not.

The legislative history of section 933, as well as the legislative history of section 421 and their predecessor sections, contains nothing to indicate that Congress ever considered the problem present in this case. The case law cited by the parties is likewise inconclusive. It is apparent, however, that the purpose for granting employee stock options after considerable litigation was not for a nontaxable purpose of granting a proprietary interest, but, instead, for the purpose of compensating the employee as the Supreme Court held in *Commissioner v. LoBue*, 351 U.S. 243 (1956). Since that time the Treasury Regulations have consistently taken such a position. In tracing through the historical development of legislation concerning employee stock options whether qualified or not, restricted or not, having an ascertainable fair market value or not, there is a pervading common thread—compensation. In the instant case, the compensation was for services performed in Puerto Rico. We, therefore, conclude that petitioner Fuentes should not be taxed on such compensation when he sold some of the stock in 1974.

Section 933(2) speaks of income *derived* from Puerto Rican sources which is *attributable* to the period of residency in Puerto Rico. Fuentes not only *received* the option while a bona fide resident of Puerto Rico, he *exercised* the option and *purchased* the stock while a bona fide resident of Puerto Rico.

Respondent requested that we find as a fact that Fuentes did not report on his Puerto Rican income tax return for 1972 compensation resulting from the exercise of his stock option.

Petitioners Fuentes object on the grounds of materiality. We agree with petitioners that such fact is not material. Respondent has not enlightened us with the Puerto Rican tax law applicable to 1972 nor does respondent point to any rule which holds that compensation arising from a stock option granted in Puerto Rico must be included in income in one jurisdiction if it was not included in income in the other jurisdiction.

Respondent argues that because Fuentes has failed to demonstrate that a specific exclusion from income applies to the stock he acquired pursuant to the option, that section 1.421–6, Income Tax Regs., applies to him. We hold that Fuentes has sufficiently demonstrated the applicability of section 933(2) to exclude from income compensation received in the form of stock acquired pursuant to an employee stock option.

Accordingly, we hold that Fuentes is not taxable on compensation in 1974 when he sold shares of Burnup & Sims stock.

*Decisions will be entered under Rule 155 in docket Nos. 10855–75, 6532–76, and 6557–76.*

*Decision will be entered for the petitioners in docket No. 6533–76.*