SAUL P. STEINBERG and BARBARA STEINBERG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PULTE HOME CORPORATION, PULTE LAND OF ILLINOIS CORPORATION, PULTE LAND OF MICHIGAN CORPORATION, PULTE HOMES OF MICHIGAN CORPORATION and PULTE HOMES OF ILLINOIS CORPORATION, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Steinberg v. Commissioner
Docket Nos. 11852-77, 11859-77.
United States Tax Court
T.C. Memo 1983-534; 1983 Tax Ct. Memo LEXIS 258; 46 T.C.M. (CCH) 1238; T.C.M. (RIA) 83534; August 29, 1983. Robert B. Hodes,Peter *261 W. Schmidt and Anthony F. Phillips, for the petitioners in docket No. 11852-77. Miles Jaffe,Charles Nida,Roger Cook,Michael B. Shapiro and Stephen Wasinger, for the petitioners in docket No. 11859-77. Richard M. Campbell and Toby R. Rosenberg, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the individual income tax of petitioners Saul P. Steinberg and Barbara Steinberg for the calendar year 1971 in the amount of $616,393. Respondent determined deficiencies in the corporate income tax of petitioners Pulte Home Corporation and certain of its subsidiaries for the following taxable years in the amounts stated: 1965
1967
1968
1970
Pulte Home Corporation
$164.00
$5.00
$14,392.00
$4,660.00
Pulte Land of Illinois Corp.
57,842.73
Pulte Land of Michigan Corp.
15,177.00
Pulte Homes of Michigan Corp.
39,416.00
Pulte Homes of Illinois Corp.
164,575.90
The issues for decision are: (1) Did the transfer of 81,000 shares of Pulte Homes stock to Saul P. Steinberg on March 24, 1971, to the extent that the *262 value of such shares exceeded $227,500, result in a deductible expense by petitioner Pulte Home Corporation in 1971; [1] and (2) the fair market value as determined under section 83[2] of the 81,000 shares of stock and a warrant for 10,000 shares transferred to Mr. Steinberg as of the dates of the transfers. FINDINGS OF FACT Petitioners Saul P. Steinberg and Barbara Steinberg, husband and wife, resided in New York, New York, at the time of the filing of their petition herein. Petitioners filed a joint Federal income tax return for the calendar year 1971 with the Internal Revenue Service Center, Andover, Massachusetts. Petitioners Pulte Home Corporation, Pulte Land of Illinois Corporation, Pulte Land of Michigan Corporation, Pulte Homes of Michigan Corporation, and *263 Pulte Homes of Illinois Corporation each had its principal office in West Bloomfield, Michigan, at the time of the filing of its petition herein. Each petitioner corporation, other than Pulte Home Corporation, was during the year 1971 a wholly owned subsidiary of Pulte Home Corporation. These petitioners and other wholly owned subsidiaries of Pulte Home Corporation filed a consolidated return for the taxable year ended December 31, 1971. Each of these petitioners filed a separate return for all relevant taxable years prior to the year 1971. Petitioner Saul P. Steinberg graduated from Wharton School, University of Pennsylvania, in 1959. Shortly after his graduation, Mr. Steinberg started his own computer company, Ideal Leasing, whose registered trademark was Leasco. Ideal Leasing went public in 1965. There was considerable interest on the stock market in shares of the company's stock and the public trading price of the stock increased greatly within the 2-year period after the public offering. The stock in 1967 and 1968 traded for a price which represented a very high ratio of price to earnings of perhaps 30. Mr. Steinberg was able to use this high public trading price for *264 the stock of Ideal Leasing in acquiring the Reliance Group of insurance companies in 1968. Reliance Group, Inc., is primarily an insurance holding company. The companies in the Reliance Group offer all types of insurance coverage. The group since 1970 has had annual revenues ranging from $600 million to $1 billion. For the period 1970 to 1971, the Reliance Group had annual revenues of approximately $600 million. Mr. Steinberg, as of the time of the trial of this case, was the chief executive officer of Reliance Group, Inc., and the chairman of its board. Mr. Steinberg had held similar positions with the predecessor of Reliance Group, Inc.
Mr. Steinberg is very sophisticated in financial matters. By the late 1960's he had acquired a reputation in the financial community as a skilled financial expert. Mr. Steinberg was viewed as a very aggressive and successful entrepreneur. Pulte Home Corporation was founded by William J. Pulte in 1956. In 1971, Pulte Homes[3] was primarily engaged in the business of building and marketing single-family houses on land which it acquired, subdivided and developed. *265 Until March 5, 1969, when Mr. Pulte sold an aggregate of 17,400 shares of Pulte Homes common stock to certain key employees of the corporation, all of its outstanding stock was owned by Mr. Pulte and members of his immediate family. Pulte Homes became publicly owned as a result of a public offering on May 6, 1969. Pulte Homes sold 200,000 shares of its common stock to the public on that date. As of October 1970, there were outstanding 1,366,827 shares of Pulte Homes common stock. Mr. Pulte owned 899,930 shares or 66 percent of the outstanding stock. Another 88,830 shares or 6 percent were held in trust for Mr. Pulte's minor children. As of March 31, 1971, there were outstanding 1,370,312 shares of Pulte Homes common stock. As of April 9, 1971, Mr. Pulte was the beneficial and record owner of 620,849 shares (45.3 percent) of Pulte Homes common stock and was the record owner of 52,200 shares (3.8 percent) subject to certain key employee purchase rights and 89,000 shares (6.5 percent) subject to the exercise of certain warrants. In addition, 88,830 shares (6.5 percent) were held in a trust for the benefit of Mr. Pulte's minor children. As of September 1, 1971, there were 1,912,583 *266 shares of Pulte Homes common stock outstanding. Mr. Pulte and his children as of this date owned 69.3 percent of the outstanding shares. Pulte Homes had built approximately 10 homes in its first year of operation, 1956. For the year 1981, Pulte Homes built approximately 5,000 homes. Up until 1963 or 1964, Pulte Homes built homes almost exclusively in the Detroit metropolitan area. Its business, as a result, was highly dependent on economic conditions in the Detroit area. In 1963, Pulte Homes decided to build homes in geographically diverse markets so that its business would not be entirely subject to economic conditions in one particular area. In 1964, Pulte Homes began building homes in the Washington, D.C. area; in 1966, it commenced building homes in the Chicago area; in 1968, operations were further expanded to the Atlanta area; in 1969, it began building homes in the Colorado Springs area; and in 1970, it began building homes in the Denver area. The homebuilding business of Pulte Homes has required and continues to require large amounts of capital. When the company was founded, it specialized in building custom homes. In 1960, it began development of its own subdivisions, *267 participating in all phases of development, including the acquisition, development, improvement and subdivision of land, and the design, construction and sale of homes on each lot in the subdivision. Until 1969, Pulte Homes concentrated only on high-priced homes of traditional architecture. In 1969, the company expanded operations to development of subdivisions containing low-priced single-family homes and townhouses, and also began construction of medium-priced homes. The consolidated balance sheet for Pulte Homes for the years 1969 and 1970 included in the Form 10-K filed by Pulte Homes with the Securities and Exchange Commission (SEC) on March 30, 1971, showed the following assets and liabilities; Pulte Home Corporation and Subsidiaries CONSOLIDATED BALANCE SHEETS December 31, 1970 and 1969 ASSETS
1970
1969
CURRENT ASSETS
Cash
$ 1,271,396 $ 490,786 Notes receivable - customers
439,309 577,945 Accounts receivable
Customers
5,225,455 2,675,379 Other
134,820 225,859 5,360,275 2,901,238 Income taxes refundable
271,594 Costs on uncompleted contracts, less
related billings of $1,466,700
246,684 Inventories
Homes completed and under construction
5,493,420 3,807,153 Land and improvements
16,075,376 14,365,779 21,568,796 18,172,932 Escrow deposits and prepaid expenses
482,652 581,109 Total current assets
29,394,022 22,970,694 FIXED ASSETS - AT COST
Property, model furnishings and equipment
806,614 651,734 Less accumulated depreciation
(268,618)
(222,379)
537,996 429,355 OTHER ASSETS
Non-current notes receivable and sundry
271,653 166,230 $30,203,671 $23,566,279 *268 LIABILITIES
1970
1969
CURRENT LIABILITIES
Notes payable to banks - unsecured a
$ 3,000,000
$ 2,590,368
Mortgages, notes and land contracts payable b
14,261,607
11,630,478
Accounts payable
3,473,659
2,433,635
Accrued liabilities
946,453
445,966
Customers' contract payments and deposits
531,713
73,489
Income taxes
Current
208,402
263,798
Deferred
911,735
587,189
$1,120,137
850,987
Total current liabilities
23,333,569
18,024,923
COMMITMENTS AND CONTINGENCIES
STOCKHOLDERS' EQUITY
Preferred stock, no par value - authorized
100,000 shares
Convertible preferred-Series A, authorized
25,000 shares
Issued and outstanding, 7,500 shares of
$100 assigned value c
750,000
Common stock, $1 par value - authorized
2,500,000 shares
Issued and outstanding, 1,366,827 and
1,320,260 shares, respectively
1,366,827
1,320,260
Additional paid-in capital
1,952,451
2,019,668
Retained earnings
2,800,824
2,201,428
Total stockholders' equity
6,870,102
5,541,356
$30,203,671
$23,566,279
*269 Mr. Pulte, the majority shareholder and head of the management of Pulte Homes, considered himself financially unsophisticated during the year 1971 and prior years. The only means of obtaining capital with which Mr. Pulte was familiar prior to 1969 were land development and construction loans. In May of 1969, Pulte Homes realized net proceeds of $2,520,000 from a public offering of 200,000 shares of its common stock. Contemporaneous with this public offering, Pulte Homes adopted a qualified employee stock option plan under which options might be granted to its officers and certain key employees. Mr. Pulte's purpose in having Pulte Homes go public was to facilitate implementation of the stock option plan, which was being adopted in order to encourage certain of the company's key employees to remain with the company. In 1968, two of the then major building companies in the country had tried to hire certain employees of Pulte Homes by offering them higher salaries. At about the time Pulte Homes' 1969 public offering was being arranged, there was considerable interest on Wall Street in the stock of homebuilding companies. The homebuilding industry at that time was perceived *270 to have great potential. During this time, Mr. Pulte continually was invited to New York City for meetings with investment analysts and other investment people.Mr. Pulte, at one of such meetings, met an individual named James Grosfeld. Mr. Grosfeld was then a general partner in a partnership that invested in securities and he was also employed as the managing director of an offshore fund that invested in securities. Mr. Grosfeld came to know of Pulte Homes through reading the company's initial prospectus which had been circulated prior to the 1969 public offering. Subsequently, but prior to the time the company shares were publicly offered, Mr. Grosfeld had several conversations with Mr. Pulte and also conducted an interview with other officers of the company. When the shares were publicly offered, Mr. Grosfeld, acting on behalf of his investment partnership and the offshore fund, purchased Pulte Homes shares. However, Mr. Grosfeld continued to follow Pulte Homes and periodically made calls to Mr. Pulte in an effort to obtain information as to the activities of the company. In late 1969 or early 1970, Mr. Pulte concluded that his company needed help in the financial area. *271 Mr. Pulte then made inquiries of two acquaintances as to whether either of them knew of an individual who would be capable of and interested in helping him.One of the acquaintances he contacted was Mr. Grosfeld. Mr. Grosfeld had followed Mr. Steinberg's career with Ideal Leasing and the Reliance Group. Mr. Grosfeld further believed that Mr. Steinberg had also given financial advice to other companies in return for receiving shares in such companies. Mr. Grosfeld contacted Mr. Steinberg and acquainted him with Pulte Homes. Mr. Grosfeld represented the company to be one with potential which at present was inadequately capitalized. When Mr. Steinberg indicated his interest in Pulte Homes, Mr. Grosfeld arranged a meeting between Mr. Steinberg and Mr. Pulte. In 1970, Mr. Steinberg and Mr. Pulte had several meetings. Additionally the two were in contact with one another several times a week, either directly or through Mr. Grosfeld acting as an intermediary. Mr. Steinberg had a friend named Fred Carr who had retired from a position as the manager of a mutual fund. Mr. Steinberg and Mr. Carr had previously joined in giving financial advice to various companies in return for *272 receiving stock in such companies. Mr. Carr had organized a company called Gateway Securities Corporation (Gateway). Pursuant to negotiations between Mr. Steinberg, Mr. Carr and Mr. Pulte, a last draft of a financing services agreement to be executed by Pulte Homes, Mr. Pulte and Gateway was written. The draft of the agreement stated the following as its purpose: 1. Purpose. Company and Pulte hereby jointly and severally employ Gateway, upon the terms and conditions set forth herein, to assist Company in obtaining capital financing in the manner hereinafter set forth. This Agreement shall not be construed to cause or to employ Gateway to perform or render any services other than as specifically set forth herein, nor shall it be construed to cause Pulte or the Company to transfer securities of the Company to or to otherwise compensate Gateway other than as specifically set forth herein. The draft agreement provided that Gateway would endeavor to raise specific amounts of capital for Pulte Homes in three stages as follows: (1) Within 60 days Gateway was to provide Pulte Homes with a written commitment from one or more persons or entities for the purchase of 25,000 shares *273 of Pulte Homes authorized but unissued preferred stock at a total purchase price of $2.5 million, which stock was to be purchased not later than 90 days from the date of the financing agreement. [4]
(2) Within 11 months after the date of the agreement, Gateway was to provide Pulte Homes with a written commitment, in addition to the written commitment described in paragraph (1) above, executed by one or more persons or entities, to purchase within 1 year of the date of the financing service agreement, at an aggregate purchase price of $2.5 million, debt securities issued by Pulte Homes in the principal amount of $2.5 million. [5]
(3) Within any time during a 5-year period commencing upon the date Pulte Homes received the purchase price from the sale of its debt securities from the second stage (or the date it elected not to accept a written commitment for purchase of such debt securities, thereby satisfying all of the provisions of the agreement), Gateway was to use its best efforts to provide the company with one or more written commitments, executed by one or more persons or entities, to purchase for an aggregate purchase price of not less than $1 million nor more than $10 million *274 debt or equity securities to be issued by Pulte Homes, having such terms, conditions, rights and privileges as are then customary in the industry for such financing. [6]
*275 In return for successfully raising capital for Pulte Homes in the stages described above, Gateway would receive either shares of Pulte Homes common stock or warrants to purchase certain specified numbers of Pulte Homes common. Upon the receipt by Pulte Homes of the purchase price for the convertible preferred shares to be issued in the first stage, Mr. Pulte would transfer to Gateway 66,667 shares of Pulte Homes common stock, $1 par value, which he owned. Upon the receipt by Pulte Homes of the purchase price for the debt securities to be issued in the second stage described above, Mr. Pulte would transfer to Gateway an additional 66,667 shares of Pulte Homes common stock, $1 par value, which he owned. Upon the receipt by Pulte Homes of each $1 million increment of the purchase price for the debt or equity securities issued in the third stage described above, Pulte Homes would deliver to Gateway, as to each such increment, a common stock purchase warrant granting Gateway the right to purchase, at any time within 7 years after the date of the issuance of warrants given to the purchasers of the company's debt securities, 10,000 shares of the company's common stock, $1 par value, *276 for a purchase price of $10 per share. Warrants were to be issuable only after each $1 million purchase price increment was received by Pulte Homes, but in that event were to be issuable regardless of whether or not additional increments were thereafter attained. It was also further provided in the draft agreement that the common stock to be acquired by Gateway from Mr. Pulte upon its successful completion of the first and second stage, would have the same registration rights as the common shares underlying the common stock purchase warrants which it was contemplated might be issued to Gateway as part of the third stage. In late November or early December of 1970, Mr. Carr was unable to come up with the amount of money needed in order to purchase the number of convertible preferred shares which he and Mr. Steinberg had agreed Mr. Carr would purchase. Because of this fact, the draft agreement with Gateway was not entered into. A purchase agreement, dated December 24, 1970, for 7,500 shares of Pulte Homes convertible preferred stock, series A, was subsequently entered into by Pulte Homes, Mr. Steinberg, and Julius Steinberg (Mr. Steinberg's father). Under the agreement, Mr. *277 Steinberg was to purchase 5,000 of the shares and his father was to purchase 2,500 of the shares at a price of $100 per share. The agreement contemplated that delivery of the shares and payment for them would take place on December 31, 1970. A Financing Services Agreement, dated December 31, 1970, was entered into by Mr. Steinberg, Pulte Homes and Mr. Pulte. This agreement was substantially similar to the draft of the agreement that was to have been entered into by Gateway, Pulte Homes and Mr. Pulte. The agreement provided, in pertinent part, as follows: 1. Purpose. Company and [Mr.] Pulte hereby jointly and severally employ Steinberg, upon the terms and conditions set forth herein, to assist Company in obtaining capital financing in the manner hereinafter set forth. This Agreement shall not be construed to cause Steinberg to perform or render any services other than as specifically set forth herein, nor shall it be construed to cause [Mr.] Pulte or the Company to transfer securities to Steinberg other than as specifically set forth herein. 2. Duties of Steinberg.
(a) On the date hereof, Steinberg and one other investor have purchased from the Company 7,500 *278 shares of the Company's preferred stock, Series A, no par value, for an aggregate purchase price of $750,000. (b) Within forty-five (45) days after the date hereof, Steinberg will use his best efforts to provide Company with a written commitment, executed by one or more persons or entities, to purchase not later than sixty (60) days from the date hereof for an aggregate purchase price of $1,750,000, 17,500 shares of the Company's authorized but unissued preferred stock, series A, without par value. (c) No later than June 30, 1971, Steinberg will use his best efforts to provide Company with a written commitment satisfactory to Company (in addition to the written commitment referred to in paragraph 2(b) hereof) executed by one or more persons or entities, to purchase not later than July 31, 1971 for an aggregate purchase price of $2,500,000, debt securities issued by the Company having a principal amount equal to such purchase price, * * * [7]
(d) At any time and from time to time within a five year period commencing upon the date the Company receives the purchase price for the sale of its securities as set forth in paragraph 2(c) hereof, Steinberg will use his best efforts to *279 provide Company with one or more written commitments (in addition to those to be delivered under paragraph 2(b) and 2(c) hereof), executed by oneor more persons or entities, to purchase, for an aggregate purchase price of not less than $1,000,000 nor more than $10,000,000, debt or equity securities to be issued by Company having such terms, conditions, rights and privileges as are then customary in the industry from such financing, given the condition of the securities market and the size and nature of the Company. In return for his services in helping Pulte Homes obtain capital financing, Mr. Steinburg was to receive a specified number of Pulte Homes shares and warrants. The agreement provided in this regard as follows: 3. Acquisition of Securities by Steinberg.
(a) Concurrently with the receipt by the *280 Company of the purchase price for the securities issued in the transaction referred to in paragraph 2(a) hereof, [Mr.] Pulte will transfer, assign and convey to Steinberg all of his right title and interest in (free and clear of all liens, claims and encumbrances) 30,000 fully paid, nonassessable shares of the Company's common stock, par value $1.00 per share, owned by [Mr.] Pulte. [8]
(b) Concurrently with the receipt by the Company of the purchase price for the securities issued in the transaction referred to in paragraph 2(b) hereof, [Mr.] Pulte will execute and deliver to Steinberg a Common Stock Purchase Warrant attached hereto as Exhibit 8, granting to Steinberg the right to purchase from [Mr.] Pulte, at any time within twenty (20) years after date the Company issues its preferred stock, Series A, pursuant to paragraph 2(b) hereof, 70,000 shares of the Company's common stock, $1.00 per share par value, for a purchase price of $0.10 per share. Such Common Stock Purchase Warrant will be duly executed and legally binding obligation of [Mr.] Pulte enforceable in accordance with its terms. * * * (c) Concurrently with the receipt by the Company of the purchase price *281 for the [debt] securities issued in the transaction referred to in paragraph 2(c) hereof, [Mr.] Pulte will execute and deliver to Steinberg a Common Stock Purchase Warrant attached hereto as Exhibit B, granting to Steinberg the right to purchase from [Mr.] Pulte, at any time within twenty (20) years after date the Company issues its Warrants pursuant to paragraph 2(c) hereof, 100,000 shares of the Company's common stock, par value $1.00 per share, for a purchase price of $0.10 per share. * * * (d) Concurrently with the receipt by the Company of each $1,000,000 increment of the purchase price for the securities issued in the transaction(s) referred to in paragraph 2(d) hereof, Company will execute and deliver to Steinberg, as to each such increment, a Common Stock Purchase Warrant, in the form and substance of the Common Stock Purchase Warrant attached hereto as Exhibit A, granting to Steinberg the right to purchase, at any time within seven (7) years after date the Company issues its Warrants pursuant to paragraph 2(c) hereof, 10,000 shares of the Company's common stock, $1.00 par value, for a purchase price of $10.00 per share. Such Common Stock Purchase Warrant will be duly *282 authorized, executed and issued by any on behalf of the Company and will constitute a valid and legally binding obligation of the Company enforceable in accordance with its terms. * * * [9]
The agreement also contained the following provisions as to automatic termination: This Agreement shall automatically terminate upon the occurrence of any of the following events: (1) the failure of Steinberg to deliver an acceptable written commitment(s) as provided for in either paragraph 2(b) or 2(c); or (2) the failure to purchase *283 the Company's securities as provided in paragraphs 2(b) or 2(c) hereof. Such termination shall not, however, release Company from any obligation hereunder accruing prior to such termination. As a part of their overall agreement, Mr. Steinberg and Mr. Pulte also entered into an indemnification agreement, dated December 31, 1970. Under the indemnification agreement, Mr. Steinberg agreed to indemnify Mr. Pulte for any tax liabilities which he incurred from the transfer of any of his shares to Mr. Steinberg pursuant to the provisions of the financing services agreement; however, such indemnification was not to be in excess of an amount equal to $1.60 per share transferred to Mr. Steinberg. [10]
*284 Mr. Steinberg, in a letter agreement dated December 31, 1970, agreed to transfer one-third of any shares and warrants received by him under the financing services agreement to Mr. Grosfeld. [11] Mr. Grosfeld agreed to reimburse Mr. Steinberg to the extent of one-third of any amount Mr. Steinberg was required to pay pursuant to his indemnification agreement with Mr. Pulte. On December 31, 1970, Mr. Steinberg, pursuant to the Financing Services Agreement, purchased 5,000 shares of Pulte Homes convertible preferred stock, series A, for a cash consideration of $500,000 and *285 induced his father to purchase 2,500 shares of the same type for a cash consideration of $250,000. The preferred shares were convertible by each purchaser into shares of common stock in the company. The conversion ratio was 13-1/3 shares of common stock for each share of convertible preferred stock. As a result of these purchases, Mr. Steinberg received from Mr. Pulte 30,000 common shares of Pulte Homes.[12] Neither the preferred nor the common shares were registered under the Securities and Exchange Act of 1933. On January 18, 1971, Mr. Steinberg brought about the sale of 5,000 shares of Pulte Homes convertible preferred stock, series A, to Lawton General Corporation and the sale of 2,500 of the same type shares to Meshulem Riklis. These securities were acquired at the same prices and pursuant to the same terms and conditions as those purchased by Mr. Steinberg and his father on December 31, 1970. In a letter dated January 18, 1971, to Mr. Steinberg, Mr. Pulte stated that by virtue of the two sales of convertible preferred shares brought about by Mr. Steinberg-- which constitutes partial *286 performance by you under Paragraph 2(b) of said Financing Services Agreement, I agree * * * to deliver to you as pro rata payment a common stock purchase warrant * * * to purchase 30,000 shares of Common Stock of Pulte Home Corporation. * * * The letter stated that the warrant would be delivered to Mr. Steinberg promptly. [13]
In the early part of 1971, the financial markets had considerably improved. At least by January 18, 1971, Mr. Steinberg and Mr. Grosfeld had concluded that there was a very good possibility of raising a large amount of capital for Pulte Homes through a public offering of the company's common stock. Mr. Steinberg and Mr. Grosfeld had also concluded that it would be advantageous to Pulte Homes to sell such common shares to raise capital rather than to raise capital *287 through the sale of the convertible preferred shares. Mr. Grosfeld and Mr. Steinberg considered the 10 percent annual dividend the company was required to pay on the preferred shares to be excessively high. Mr. Steinberg and Mr. Grosfeld informed Mr. Pulte of their conclusions. In discussions among the three, Mr. Pulte stated that the underwriter who had handled the 1969 public offering of Pulte Homes was in financial difficulty and would probably be unable to underwrite a second public offering. Mr. Steinberg stated that he would see what he could do with respect to arranging an underwriting. Mr. Steinberg and Mr. Grosfeld had talked to various persons engaged in underwriting. Mr. Grosfeld had discussed a possible underwriting of a public offering of Pulte common shares by Dean Witter with a friend of his who worked for that firm. Dean Witter decided against doing the underwriting. Mr. Steinberg talked to his friend, A. Robert Towbin, one of the principals in the investment bank firm of C.E. Unterberg, Towbin Co., about Mr. Towbin's firm underwriting a public offering of Pulte Homes common stock. As a result of his conversations with Mr. Steinberg, Mr. Towbin visited Detroit *288 to discuss the possibility of his firm doing an underwriting for Pulte Homes. Mr. Towbin subsequently indicated to Mr. Steinberg and Mr. Grosfeld that as a result of his discussions with the management of his firm and with Mr. Pulte, he was interested in doing the underwriting of the public offering by Pulte Homes. All of the persons engaged in underwriting with whom Mr. Steinberg and Mr. Grosfeld had discussions expressed the view that the existence of the Financing Services Agreement would create problems with respect to the performance of any underwriting. According to the underwriters, the National Association of Securities Dealers, Inc. (NASD) or SEC had a rule which prohibited over a certain percentage of the dollar proceeds raised in an underwriting being received as brokerage or finder's fees. Mr. Towbin, Mr. Steinberg's friend, insisted that the Financing Services Agreement formally be terminated.The lawyers representing Pulte Homes, Mr. Steinberg and Mr. Grosfeld also had questioned going forward with an underwriting with the Financing Services Agreement in effect. Mr. Steinberg, Mr. Grosfeld and Mr. Pulte decided that Pulte Homes should attempt to raise capital in *289 a public offering of shares of its common stock with the underwriting being handled by Mr. Towbin's firm. Mr. Steinberg and Mr. Grosfeld told Mr. Pulte that they still wanted the shares they were to have received from him under the Financing Services Agreement. They wanted the shares transferred prior to the underwriting. Pulte Homes, Mr. Pulte and Mr. Steinberg executed an amendment to the Financing Services Agreement which was dated March 9, 1971. This agreement provided in part as follows: 1.For services rendered under the Agreement to the date hereof, Steinberg received from Pulte 30,000 shares of the Company's Common Stock and will receive from Pulte a Common Stock Purchase Warrant expiring 20 years after the date of issuance to purchase 30,000 shares of the Company's Common Stock from Pulte at a price of $ .10 per share in the form of the Common Stock Purchase Warrant annexed hereto as Exhibit I. 2. Except for the compensation described above in Paragraph 1, neither the Company, nor Pulte is, from and after the date hereof, in any way obligated to pay additional compensation to Steinberg for any prior or future financial services to the Company under the Agreement. *290 3. Except for the services rendered in connection with the matters relating to the compensation described in Paragraph 1 above, Steinberg is not, from and after the date hereof, in any way obligated to provide additional financial services to the Company under the Agreement. The form of the common stock purchase warrant attached as an exhibit to the amendment to the Financing Services Agreement contained provisions with respect to the registration of all or any part of the shares held by the warrant holder. Pulte Homes agreed that any any time after April 30, 1972, it would upon written request from the warrant holder (1) promptly cause to be prepared and filed a registration statement, (2) use its best efforts to cause such registration statement to become effective at the earliest possible date after its filing, (3) take such other action as might reasonably be requested by the warrant holder to effect qualifications and compliance with any State security laws designated by the warrant holder with respect to the sale of his shares, (4) deliver to the warrant holder such copies of the prospectus in preliminary and definitive form as might reasonably be required, and (5) cause *291 to be prepared and filed any additional post-effective amendments or supplements which might be necessary or appropriate to permit the prospectus to be used during the period of 9 months after the effective date of any registration statement in connection with the sale of the shares by the warrant holder. Under date of March 15, 1971, a member of the Chicago law firm which was tax counsel to Pulte Homes sent a letter to Mr. Pulte which stated as follows: Enclosed are copies of letters which I have sent today to both [Mr. Steinberg's lawyer] and Jim Grosfeld, together with a suggested form of letter which I requested from Saul Steinberg. I am also enclosing a copy of a form of letter which I would like to receive from you covering the same matters covered in the letters requested from Saul and Jim. You will note that I have not attempted to describe the current arrangement between yourself and Saul and Jim for the reasons indicated in my letter to [the lawyer]. I have given some additional thought to this matter and believe that the only method in which the transaction could be cast to soften its impact on the reader of a prospectus would be by setting the transaction up *292 as a five or more year contract for services with the consideration payable over the term of the contract rather than all at the beginning. I don't know whether this is feasible, but I believe that it would be in your best interests and would definitely soften the impact of the disclosure in a prospectus. One of the enclosures in the letter to Mr. Pulte was a copy of the letter to the attorney for Mr. Steinberg. The body of this letter contained the following pertinent paragraphs: Enclosed is a copy of a proposed from of letter which I would like to receive from Saul Steinberg in connection with our preparation of a registration statement for the subject Company. I believe the letter is substantially self-explanatory and covers only matters which Bill, Saul and Jim have previously advised me by telephone. The missing paragraph 4 of the enclosure should cover, in Saul's own words, hopefully, his current understanding with Bill Pulte regarding the payment by Bill to him of additional shares of Bill's stock. I attempted to draft that paragraph myself, but gave up because I do not know what the current agreement between the parties is, and I do not want to put words in anyone's *293 mouth. You may wish to consider adding a parenthetical phrase such as "other than as described in the following paragraph" to the end of paragraph 3 of the enclosure. You will note that I contemplate delivery of the warrants by Bill prior to Saul's signing the letter. In this connection, I have forwarded the warrants to Bill for his signature today, together with a revision of the Escrow Agreement. In reading the Escrow Agreement over the week-end, it seemed to me that a few typographical errors slipped into the final copies of the same and I am enclosing herewith a marked version of your execution copy showing in red the changes I made in this document.
The copy of the proposed letter which Pulte Homes' lawyer had prepared and wished to receive back from Mr. Pulte contained the following pertinent provisions: You have requested certain information from the writer in connection with your preparation, as counsel for the subject Company, of a Registration Statement of Form S-1 to be filed with the Securities and Exchange Commission under the Securities Act of 1933 covering a proposed public offering of 400,000 to 500,000 shares of the Company's common stock. In connection with *294 your request, please be advised as follows: 1. The Financing Services Agreement dated December 31, 1970 among Pulte Home Corporation (the "Company"), Saul Steinberg ("Steinberg") and the writer (the "Agreement"), an executed copy of which Agreement has previously been furnished to you, completely and fully sets forth the entire agreement between the parties regarding Steinberg's furnishing of financial services to the Company and represented the only agreement between such parties on the foregoing or any related matter. 2. The Agreement, in accordance with the provisions of paragraph 6(a)(1) thereof was automatically terminated upon the expiration of 45 days subsequent to December 31, 1970 and said Agreement has not been modified or extended in any manner, either orally or by written instrument, subsequent to its execution, except to the extent that the delivery of pro rata consideration by the writer to Steinberg in connection with the sale of certain of the securities referred to in paragraph 2(b) thereof may be deemed to have been a modification of said Agreement. 3.For his services under the Agreement the writer transferred to Steinberg 30,000 shares of the Company's *295 common stock and 20 year warrants to purchase from the writer an additional 30,000 shares of the Company's common stock at a price of $ .10 per share and neither the writer nor the Company is in any way obligated to pay additional compensation to Steinberg for any prior or future financial services to the Company. On March 24, 1971, Mr. Pulte personally transferred to Mr. Steinberg for no cash consideration 81,000 shares of Pulte Homes common stock owned by him. On that same date Mr. Pulte transferred to Mr. Grosfeld certain warrants to purchase 59,000 shares of Pulte Homes common stock at 10 cents per share. The shares received by Mr. Steinberg were unregistered and could not be publicly traded prior to registration. Mr. Steinberg did not have the right to require Pulte Homes to register the shares until April 30, 1972. On March 22, 1971, Mr. Pulte and Pulte Homes both executed a common stock purchase warrant under which Mr. Steinberg was entitled to purchase all or any part of 10,000 shares of Pulte Homes common stock owned by Mr. Pulte at a price of 10 cents per share. The warrant was identical to the warrant form attached as an exhibit to the March 9, 1971, amendment to *296 the Financing Services Agreement. In this warrant document it was stated that Mr. Pulte agreed that simultaneously with the delivery of this warrant he would deliver to the First Jersey National Bank, as escrow agent, the shares for delivery upon exercise of all or any part of this warrant. A copy of the escrow agreement under which First Jersey National Bank would serve as escrow agent was attached to the warrant document. In this warrant document, Pulte Homes also agreed that the holder of the warrant would have certain registration rights.
On March 25, 1971, Mr. Steinberg received the warrant. On April 7, 1971, Mr. Steinberg exercised the warrant to purchase 10,000 Pulte Homes common shares. The board of directors of Pulte Homes issued a notice dated May 5, 1971, to the company's shareholders of the annual meeting of the shareholders to be held on June 3, 1971. One of the purposes of the meeting of the shareholders was the election of the five individuals who were to serve as directors of the company until the following annual meeting of the shareholders. Attached to the notice was a proxy statement in which the management of Pulte Homes solicited proxies from shareholders *297 under which management would be given an irrevocable proxy to vote the shares of a shareholder at the annual meeting. Mr. Steinberg was listed in management's slate of nominees for directors. Mr. Towbin, on behalf of his firm, in a letter dated May 24, 1971, to Mr. Pulte, stated the following: As a result of our discussions with you and your associates, as well as Mr. Saul P. Steinberg and Mr. James Grosfeld, C.E. Unterberg, Towbin Co., proposed to sell, subject to market conditions, approximately 600,000 shares of Common Stock of Pulte Home Corporation. 500,000 shares would be sold for the account of the Company, and approximately 100,000 shares for the account of two Convertible Preferred Stock Series "A" Shareholders; these shares being the result of their conversion of that stock. It is our understanding that the balance of preferred shareholders will convert and hold the Common shares. The price will be related to the Over-the-Counter Market for the shares at the time of the offering, and the underwriting compensation would be not more than 7-1/2 percent. This is neither an agreement to purchase or sell shares of Common Stock of Pulte Home Corporation, nor is it an *298 agreement to enter into an underwriting agreement. It is, however, an expression of our present intentions. Mr. Towbin, in his discussions with Mr. Steinberg, had made it an express condition of his company's underwriting the Pulte Homes stock that Mr. Steinberg would not sell his shares in Pulte Homes. On June 3, 1971, Mr. Steinberg was elected as a director of Pulte Homes at the annual meeting of the company's shareholders. On or about June 30, 1971, Pulte Homes filed a registration statement with the SEC for the proposed sale to the public of 600,000 shares of its common stock. Included in the registration statement was a signed statement by Mr. Towbin, dated June 28, 1971, in which he consented to be named in the registration statement as a person expected to become a director of Pulte Homes. On September 23, 1971, Mr. Steinberg converted his 5,000 shares of Pulte Homes convertible preferred stock into 66,666 shares of Pulte Homes common stock. In the public offering in September of 1971, Pulte Homes sold 500,001 shares of its common stock at a price of $13.75 per share. Lawton General Corporation and Meshulem Riklis, having converted the 7,500 shares of Pulte Homes *299 convertible preferred stock which they had purchased on January 18, 1971, sold 99,999 common shares of Pulte Homes in connection with the same offering. Mr. Steinberg did not sell any stock under that offering. After underwriting discounts, Pulte Homes realized $12.79 per share or $6,395,012.80 from the offering. The underwriting of the offering by C.E. Unterberg, Towbin Co. had been a firm commitment underwriting. Mr. Steinberg served as a director of Pulte Homes from June 1971 until May 1973. Mr. Steinberg has never served as an officer of Pulte Homes. After Mr. Steinberg ceased to serve on the board of Pulte Homes, his only involvement with the company was as a stockholder. Sometime in 1974 or 1975, Pulte Homes filed a registration statement with the SEC in order to permit Mr. Steinberg to sell his shares in the company. At all times pertinent to the instant case, shares in Pulte Homes were traded over-the-counter. Before March 25, 1971, the company was not listed by the over-the-counter market list of the ISL Daily Stock Price Index. Between March 25, 1971, and February 3, 1972, stock in Pulte Homes was listed on the ISL Index. On February 4, 1972, Pulte Homes was listed *300 for trading on the American Stock Exchange.
For January of 1971, the National Quotation Bureau gave the following quotations of daily bid and asked prices for the common stock of Pulte Homes: BID PRICES
ASKED PRICES
1971
HIGH
LOW
HIGH
LOW
January 1 - Holiday
4
10
9 1/2
11 3/8
10 1/4
5
9 3/4
9 3/4
11 3/8
10 1/2
6
10
9 3/4
11 3/8
10 1/2
7
9 3/4
9 3/4
11 3/8
10 1/2
8
9 1/2
9 1/2
11 3/8
10 1/4
11
10
9 3/4
11 3/8
10 1/4
12
11 1/4
9 3/4
12
10 1/4
13
11 1/4
9 3/4
12
10 1/2
14
12
10
12 3/4
10 3/4
15
11 3/4
11 1/4
12 1/2
12
18
11 3/4
11 3/4
12 1/2
12 1/4
19
12 1/2
11 1/2
13 1/4
12 1/4
20
12 1/2
11 3/4
13 1/4
12 1/2
21
12 1/2
12 1/4
13 1/4
13
22
12 1/2
12 1/4
13 1/4
13
25
13 3/4
12
14 1/2
12 3/4
26
13 3/4
12 1/2
14 3/4
13 1/4
27
14 3/4
13 1/4
15 3/4
14
28
15
14 1/2
16
15 1/2
29
16
14 1/2
16
15 1/2
For March and April of 1971, the National Quotation Bureau gave the following quotations of daily bid and asked prices for Pulte Homes common stock: BID PRICES
ASKED PRICES
1971
HIGH
LOW
HIGH
LOW
March 1
16 3/4
15
17 1/2
15 3/4
2
16 3/4
16 1/2
17 1/2
17 1/2
3
16 3/4
16 3/4
17 1/2
17 1/2
4
17
16 3/4
18
17 1/2
5
17 1/4
16 1/2
18
17 1/4
8
17 1/4
16 3/4
18
17 1/2
9
17 1/2
17 1/4
18 1/4
18 1/4
10
17
17
18
17 3/4
11
17
17
18
17 3/4
12
16 3/4
16 3/8
17 1/2
17 1/2
15
16 3/4
16 1/2
17 1/2
17 1/2
16
16 3/4
16 1/4
17 1/2
17
17
17
16 1/4
17 3/4
17
18
17
16 3/4
17 1/2
17 1/2
19
17
17
17 1/2
17 1/2
22
16 3/4
16 1/2
17 1/2
17 1/4
23
16 3/4
16 1/4
17 1/2
17 1/4
24
16 1/2
16 1/4
17 1/4
17
25
16 1/4
16 1/4
17
16 3/4
26
16
15 1/2
16 3/4
16 1/2
29
15 1/2
15 1/2
16 1/2
16 1/4
30
15 1/2
14 1/2
16 1/2
15 1/2
31
15 1/4
15 1/4
16
16
*301 BID PRICES
ASKED PRICES
1971
HIGH
LOW
HIGH
LOW
April 1
15 1/2
14 1/4
16 1/2
15
2
15 1/4
14 3/4
16
15 1/2
5
15 1/4
15 1/4
16
16
6
15
14 3/4
15 3/4
15 1/2
7
14 3/4
14 3/4
15 1/2
15 1/2
8
14 3/4
14 3/4
15 1/2
15 1/4
9 (stock exchange
closed)
12
15
14 3/4
16
15 1/2
13
15 1/4
15 1/4
16
16
14
15 1/4
15 1/4
16
16
15
15 1/4
15 1/4
16
16
16
15 3/4
15 1/4
16 1/2
16
19
15 1/2
15 1/2
16 1/4
16 1/4
20
15 1/2
15 1/2
16 1/4
16 1/4
21
15 1/2
15 1/2
16 1/4
16 1/4
22
15 1/4
15 1/4
16
16
23
14 3/4
14 3/4
15 1/2
15 1/2
26
14 3/4
14 3/4
15 1/2
15 1/2
27
14 3/4
14 3/4
15 1/2
15 1/2
28 not quoted
29
15 1/4
15 1/4
16
16
30 not quoted
The above quotations by the National Quotation Bureau represent prices between dealers and do not include retail markup, markdown or commission. The quotations do not represent actual transactions. Until the first half of 1971, the only shares of Pulte Homes common stock available for poublic trading were the 200,000 shares which had been sold in the company's 1969 public offering.
On their 1971 Federal income tax *302 return, Mr. and Mrs. Steinberg reported 227,500 of income due to their receipt of 91,000 shares of Pulte Homes common stock. The return attributed a value of $2.50 per share to the shares. In its 1971 consolidated income tax return, Pulte Homes took a deduction of $1,017,360 for Mr. Pulte's transfer on March 24, 1971, of 81,000 shares of Pulte Homes common stock to Mr. Steinberg. The return stated such shares had a value of $12.56 per share. Respondent in his notice of deficiency to Mr. and Mrs. Steinberg gave the following explanation of the deficiency determined: It is determined that you received 81,000 shares of Pulte Home Corporation and Subsidiaries common stock during the year ended December 31, 1971 that had a fair market value of $1,356,750.00. Since you claimed that the fair market value of the stock was $227,500.00 your income is increased in the amount of $1,129,250.00 as prescribed by sections 61 and 83 of the Internal Revenue Code. It is also determined that during the year 1971, you acquired 10,000 shares of Pulte Home Corporation and Subsidiaries common stock at ten cents per share, which was $15.65 below fair market value. Therefore, *303 your taxable income is increased in the amount of $156,500.00 as prescribed by sections 61 and 83 of the Internal Revenue Code. Respondent in his notices of deficiency to the Pulte Homes petitioners disallowed $789,860 of the deduction of $1,017,360 claimed on the 1971 consolidated income tax return, resulting in decreases in the net operating loss carryback of the consolidated group. The notice of deficiency stated that such amount was being disallowed because-- [I]t has not been established that any amount in excess of $227,500.00 represents an ordinary and necessary business expense under section 162 of the Internal Revenue Code. Furthermore, since the fair market value of the stock was not included in the recipient's income, a deduction is denied under section 83 of the Internal Revenue Code. Mr. and Mrs. Steinberg in an amendment to their petition, conceded that the 91,000 shares received by Mr. Steinberg had a fair market value of $7.50 per share. In an amended petition, the Pulte Homes petitioners asserted that Pulte Homes was entitled to a deduction in the amount of $1,356,750 for the transfer *304 of the 81,000 shares of stock made by Mr. Pulte to Mr. Steinberg on March 24, 1971. The amended petition asserted that the value of the 81,000 shares on that date was $16.75 per share. OPINION Petitioner, Pulte Homes, contends that under the provisions of section 83(h) it is entitled to deduct in 1971 the fair market value of the stock transferred to Mr. Steinberg on March 24, 1971.Respondent contends that the shares were transferred to Mr. Steinberg primarily as compensation for his services in raising equity capital for the corporation and therefore, except to the extent of $227,500 which is allocable to other services of Mr. Steinberg, the fair market value of the shares is not deductible by Pulte Homes. Pulte Homes contends that under section 83(h) the entire fair market value of the shares is deductible even if some portion thereof was for Mr. Steinberg's services in helping arrange the public offering, and further contends that no portion was for such services but that the entire transfer was made as an inducement to Mr. Steinberg to become involved with Pulte Homes and to render ongoing services to the corporation. [14]
*305 Since we reach the issue of the interpretation of section 83(h) only if we conclude as a factual matter that the 81,000 shares of stock were transferred to Mr. Steinberg primarily for his services in raising capital for Pulte Homes, we will first address with issue, although Pulte Homes considers it as alternative to its contention that section 83(h) mandates allowances of the deduction, regardless of the nature of the services rendered. [15]
It has long been held that *306 expenses incurred by a corporation in selling shares of its stock to raise capital are nondeductible capital expenditures. Baltimore & Ohio R.R. Co. v. Commissioner,78 F.2d 460 (4th Cir. 1935), affg. 29 B.T.A. 368 (1933); Simmons Co. v. Commissioner,33 F.2d 75 (1st Cir. 1929), affg. 8 B.T.A. 631, 644-645 (1927); Protective Finance Corp. v. Commissioner,23 B.T.A. 308 (1931); Harrisburg Hospital, Inc. v. Commissioner,15 B.T.A. 1014 (1929); Peaslee-Gaulbert Co. v. Commissioner,14 B.T.A. 769 (1928); Appeal of Emerson Electric Manufacturing Co.,3 B.T.A. 932 (1926). The Financing Services Agreement dated December 31, 1970, states that the purpose of the agreement was to "employ [Mr. Steinberg] * * * to assist [the company] in obtaining capital financing * * *." This agreement enumerates the stages in which specified amounts of capital would be raised through contemplated sales of Pulte Homes convertible preferred shares or debt securities. In return for the successful raising of such capital, *307 Mr. Steinberg and Mr. Grosfeld were to receive a total of 200,000 shares of Pulte Homes stock from Mr. Pulte. Although all the capital to be raised under this agreement was not raised in the manner provided therein, since a public offering of common stock was made, as of April 1971 Mr. Steinberg and Mr. Grosfeld had received 200,000 shares of Pulte Homes common stock from Mr. Pulte. Pulte Homes argues (1) that even at the time the Financing Services Agreement was executed, the actual arrangement between the parties was primarily one whereby Mr. Steinberg was to become involved in the corporation and be available to render general financial and business advice to the corporation; and (2) in the alternative, whatever the nature of the arrangement under the Financing Services Agreement, that agreement by its terms automatically terminated since Mr. Steinberg failed to bring about the sale of an additional $1 million of convertible preferred shares within the time specified. Pulte Homes contends that the nature of the new agreement entered into did not have as its chief purpose the raising of capital. In advancing its first argument, Pulte Homes relies chiefly on the testimony *308 of Mr. Pulte. Mr. Pulte testified that the Financing Services Agreement was only the means by which the parties had agreed that Mr. Steinberg would first demonstrate to Mr. Pulte that he could produce. Mr. Pulte testified that in 1969 he realized that he did not have "all major league players on [his] team," and that he could not hope to compete with other major homebuilders without obtaining help with respect to the management of the financial end of his company's business. Mr. Pulte stated that he wanted an individual who had a "feel" for the financial aspects of his business to become actively involved in planning and executing the necessary financial moves needed to build a corporate of the strength Mr. Pulte wanted. Mr. Pulte further stated that he realized he could not obtain the services of an individual having such skills for simply a fee, and would have to give this individual an interest in the corporation. However, Mr. Pulte stated he did not simply want to give the shares in advance and run the risk of Mr. Steinberg walking away and leaving him with nothing. As a result, he stated, the Financing Services Agreement was devised so that the shares Mr. Steinberg received *309 would be tied to the capital he successfully raised for Pulte Homes. Mr. Pulte stated that once Mr. Steinberg proved himself, the two would essentially be partners in Pulte Homes, and that Mr. Steinberg would then do all he could to help build the corporation. Mr. Pulte specifically maintained that he would never have transferred the number of shares he did to Mr. Steinberg solely for the amount of capital Mr. Steinberg eventually helped to raise for the corporation. After weighing the evidence presented, we do not accept Pulte Homes' argument that the raising of capital was only an incidental or minor purpose of the original Financing Services Agreement. Mr. Steinberg, in his testimony, essentially stated that the agreement simply was for him to raise specified amounts of capital for Pulte Homes, in return for which he would receive shares of Pulte Homes common stock as compensation. The other evidence of record indicates that at the time the agreement was entered into, the company was badly in need of additional capital. Mr. Grosfeld, who later became a full-time employee of Pulte Homes and as of the time of trial was head of the company's executive committee and chairman *310 of its board, acknowledged this in his testimony. Mr. Grosfeld recalled that the attorneys in the law firm representing Mr. Steinberg had worked late into the night on New Year's Eve in order to make the $750,000 to be paid by Mr. Steinberg and his father for convertible preferred shares available to Pulte Homes. Mr. Steinberg testified that at that time certain bank loans were being called against Pulte Homes. Additionally, the balance sheet included in the statement filed by Pulte Homes with the SEC indicates that the company's only source for obtaining liquid funds, other than land development or construction loans, was a $3 million revolving credit arrangement under which the company was required to execute notes payable on demand to a local Detroit bank. Moreover, the company's pressing need for capital is confirmed by the terms of the convertible preferred shares and debt securities which it contemplated issuing for capital. An annual dividend of 10 percent was payable on the convertible preferred shares. An expert witness who testified at the trial stated that this was a high dividend rate since in January of 1971 the dividend rate on convertible preferred shares generally *311 ran between 6 and 7 percent. In addition to this annual dividend, each share of preferred was convertible into 13-1/3 shares of Pulte Homes common stock. The debt securities not only provided for an 11 percent interest rate but each purchaser of a debt security was to be entitled to a warrant to purchase one shares of Pulte Homes common stock for each $20 face amount of the debt security. [16]
Pulte Homes' second argument is that a new agreement came into being after the original Financing Services Agreement was automatically terminated, and that such new agreement did not have as its chief purpose the raising of capital. Pulte Homes, in advancing this argument, relies heavily on two documents: (1) the amendment to the Financing Services Agreement, which states that "Steinberg is not, from and after the [March 9, 1971, date of the amendment], in any way obligated *312 to provide additional financial services to the Company under the Agreement;" and (2) the letter from Mr. Pulte, dated April 26, 1971, to Mr. Steinberg which enclosed the stock certificate for the 81,000 shares which Mr. Pulte transferred to Mr. Steinberg on March 24, 1971. [17]
We do not accept the contention of Pulte Homes that the original agreement was terminated at the conclusion of the 45th day after its execution because of Mr. Steinberg's failure to furnish Pulte Homes with a written commitment of a third party to purchase an additional $1 *313 million of convertible preferred shares. It is an elementary principle of contract law that the parties to a contract are free by later mutual agreement to either modify, terminate or rescind their contract. The evidence of record strongly indicates that no termination occurred. The raising of capital for Pulte Homes from a public offering of its common stock would clearly be more beneficial for the corporation than the raising of capital from sales of its convertible preferred shares or its debt securities. During this period of time Mr. Steinberg and Mr. Grosfeld, as well as Pulte Homes, were actively participating in a cooperative effort to arrange the underwriting necessary to bring about such a public offering. Mr. Grosfeld testified as follows concerning the automatic termination provision of the original Financial Services Agreement: Well it had gone in any event if Pulte wanted it to go because it was not, we hadn't lived up to the terms of the agreement. That didn't worry us because we felt very comfortable that Bill thought that we were doing a good job. Further, *314 the inference that no such automatic termination occurred is supported by a previous modification of the original agreement. In his letter dated January 18, 1971, Mr. Pulte agreed to make partial payment of 30,000 shares to Mr. Steinberg as a result of Mr. Steinberg's bringing about the two sales of $750,000 of convertible preferred shares to Lawton General Corporation and Meshulem Riklis. It appears clear to us that, having concluded that there was a strong possibility of raising capital through a public offering, the parties by mutual consent modified their agreement so as to pursue the raising of capital by that avenue. Although the amendment dated March 9, 1971, to the Financing Services Agreement states that Mr. Steinberg is not obligated to provide additional financial services to Pulte Homes under the agreement, we conclude that this document did not represent the actual agreement of the parties. Mr. Towbin, Mr. Steinberg's friend, was insistent that the original Financing Services Agreement be taken out of the picture. The document executed on March 9, 1971, was executed to comply with this demand and did not represent the full understanding of the parties. Based on *315 the evidence presented, we conclude that prior to the execution of the amendment document the parties had agreed that Mr. Pulte would transfer to Mr. Steinberg 81,000 shares and that this transfer was primarily to compensate Mr. Steinberg for his services in arranging the underwriting of the public stock offering. Mr. Steinberg testified that the transfer of the 81,000 shares was to pay him for financial services, a major part of which was his help in arranging the public offering. [18] Further, portions of the testimony given by Mr. Grosfeld and Mr. Pulte in fact corroborate this testimony of Mr. Steinberg's. [19]
*316 Additionally, the March 15, 1971, letter from Mr. Pulte's attorney to Mr. Pulte indicates that there was a definite agreement that additional shares would be transferred to Mr. Steinberg, notwithstanding the execution of the March 9, 1971, amendment to the Financial Services Agreement. The letter further indicates that Pulte Homes was engaged in putting together a prospectus for the contemplated public offering. Based upon the evidence as a whole, it is clear to us that the 81,000 shares were transferred to Mr. Steinberg pursuant to an agreement the predominant purpose of which was the raising of capital for Pulte Homes by an anticipated public offering of its common shares. Expenses incident to the issuance of stock or in the raising of capital in general are nondeductible capital outlays. McCrory Corp. v. United States,651 F.2d 828, 833 (2d Cir. 1981). We find the transfer of the 81,000 shares, to the extent the value of such shares exceeds $227,500, to be a capital expenditure of Pulte Homes. [20]
*317 Pulte Homes contends that even if the transfer of the shares constituted a capital expenditure, it is nevertheless entitled to a deduction under section 83(h). Pulte Homes contends that the express language of section 83(h) requires that it be allowed a deduction. Generally, no deduction may be taken for a capital expenditure. McCrory Corp. v. United States,supra.See also sections 263, 261 and 161. It is settled that such expenditures must be capitalized absent a specific statutory provision clearly to the contrary. Commissioner v. Idaho Power Co.,418 U.S. 1, 16-19 (1974); Commissioner v. Lincoln Savings and Loan Assn.,403 U.S. 345, 352-358 (1971); Woodward v. Commissioner,397 U.S. 572, 573-576 (1970).Section 83(h) provides that-- there shall be allowed as a deduction under section 162, to the person for whom were performed the services in connection with which such property was transferred, an amount equal to *318 the amount included * * * in the gross income of the person who performed such services. * * * The statute further provides that such deduction, under section 162, shall be allowed for the taxable year of such person with which ends the taxable year in which such an amount is included in the gross income of the person who performed such services. Section 162, however, is subject to the limitation provided in sections 263, 161 and 261. We have examined the relevant legislative history of section 83 and are unpersuaded by Pulte Homes' argument that Congress by that section intended to allow the deduction of capital expenditures. See S. Rept. 91-552 (1969), 1969-3 C.B. 423, 502. [21] The literal language of section 83(h), that there shall be allowed a deduction under section 162, and the express mandate of the other above-cited statutory provisions, make it clear that Congress did not intend in section 83(h) to allow a deduction for capital expenditures. There is nothing in the legislative history of section 83 to indicate that Congress, in enacting that section, intended to allow the deduction of an expenditure of a capital nature simply because payment was made *319 by the transfer of property rather than by cash. It is further to be noted that in section 263 Congress expressly has made certain exceptions under which deductions are allowed for specifically enumerated types of capital expenditures. Pulte Homes recognizes that respondent's regulation (section 1.83-6(a)(1) and (4), Income Tax Regs.) specifically provides that no deduction is to be allowed to the extent the transfer constitutes a capital expenditure but argues that the regulation is invalid.[22] Since, in our view, section 83(h) on its face does not allow a deduction for a capital *320 expenditure, we consider section 1.83-6(a)(1) and (4) of the Income Tax Regulations valid. We hold that Pulte Homes is not entitled to any deduction for the transfer of 81,000 shares to Mr. Steinberg on March 24, 1971, in excess of the $227,500 allowed by respondent. *321 The amount properly includable in Mr. Steinberg's income in 1971 because of the receipt of the 81,000 shares of stock and the warrant for 10,000 shares, depends upon the value of the stock and the warrant on the date of their receipt. Mr. Steinberg argues that the warrant he received from Mr. Pulte should be valued as of January 18, 1971, rather than as of April 7, 1971, the date on which he exercised the warrant.[23]
Mr. Steinberg contends that in valuing the stock and warrant (1) the indemnification agreement he had given to Mr. Pulte should be considered; (2) that Pulte Homes was so short of capital that any value otherwise determined for the shares should be reduced significantly; (3) *322 that since Mr. Steinberg should be assumed to be the hypothetical willing seller, the value should be reduced because he would not continue to be a stockholder; (4) that the investment letter restrictions on the shares received by Mr. Steinberg should be considered in valuing the shares and warrant under section 83; and (5) that a substantial discount in the value otherwise determined should be made because of the size of the block of stock being valued. It has long been held that fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts. See section 20.2031-1(b), Estate Tax Regs. This definition is nearly as old as the Federal income, estate and gift taxes. United States v. Cartwright,411 U.S. 546, 550-551 (1973). However, in section 83 Congress has mandated a modified concept of fair market value.This section of the statute and respondent's regulations thereunder prescribe specific rules as to when *323 income from the transfer of the property is to be included in the gross income of the person rendering the services. [24]
*324 Mr. and Mrs. Steinberg contended that the warrant to purchase 10,000 shares is to be valued as of January 18, 1971. An option is property, and section 83(a)(1) states that fair market value is to be determined as of the date the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture.However, section 83(e)(3) states that the statute shall not apply to the transfer of an option which has no readily ascertainable fair market value.Where an option at the time it is granted does not have a readily ascertainable fair market value, respondent's regulations provide that section 83 shall apply at the time the option is exercised. Section 1.83-7(a), Income Tax Regs. Cf. section 83(e)(4).
In the instant case, the warrant received by Mr. Steinberg was not subject to a substantial risk of forfeiture and also was transferable. It does not follow, however, that January 18, 1971, is the date for valuation of the warrant. On that date, Mr. Pulte wrote a letter to Mr. Steinberg agreeing to transfer *325 the warrant and saying that he would endeavor to do so promptly. The letter does not say that an option to purchase 10,000 shares was actually presently given to Mr. Steinberg. The record is clear that the warrant was not transferred to Mr. Steinberg until March 25, 1971. Mr. Pulte and Pulte Homes executed the warrant document on March 22, 1971. The record does not support the contention of Mr. and Mrs. Steinberg that Mr. Steinberg had been granted an option on January 18, 1971. In our findings, we have found as a fact that the warrant was received by Mr. Steinberg on March 25, 1971. On the facts here present, we conclude that Mr. Steinberg had income on April 7, 1971, the date he exercised the warrant. [25]
*326 Mr. and Mrs. Steinberg contend that in valuing the shares the possible liability of Mr. Steinberg under the indemnification agreement he had with Mr. Pulte should be considered. Respondent contends that the indemnification agreement should not be taken into account in valuing the shares since any possible liability under that agreement represents a personal liability of Mr. Steinberg and does not affect the value of the shares. We agree with respondent. The indemnification agreement represents part of the consideration furnished by Mr. Steinberg in return for the transfer of the shares to him. Therefore, rather than affecting the value of the shares, the agreement is properly considered as a potential amount to be paid by Mr. Steinberg. An amount paid under section 83(a)(2) would reduce the amount of income Mr. Steinberg has due to his receipt of the shares. However, since any payment by Mr. Steinberg pursuant to the indemnification agreement was highly speculative, we conclude that no reduction is in order. See Redford v. Commissioner,28 T.C. 773 (1957). Mr. and Mrs. Steinberg further conclude that the value of the common stock should be reduced by *327 reason of the fact that Pulte Homes was desperately in need of capital. In our view, such a reduction is improper. Although the corporation had a need for capital, the record does not indicate that the corporation would fail or cease to be a viable business entity without an infusion of such capital. More importantly, however, it is clear that the quoted bid and asked prices by market makers in Pulte Homes common stock already take into account the economic situation of the corporation. Mr. and Mrs. Steinberg contend that if Mr. Steinberg is considered as the seller of the shares, the fact of his selling his shares in Pulte Homes would negatively impact upon the value that could be realized for the shares. We do not agree that the shares should be valued on the assumption that Mr. Steinberg is the willing seller.The willing buyer, willing seller test is an objective one and does not presume that a particular individual will be the willing seller. Propstra v. United States,680 F.2d 1248, 1251-1253 (9th Cir. 1982); Estate of Bright v. United States,658 F.2d 999 (5th Cir. 1981) *328 (en banc); Estate of Andrews v. Commissioner,79 T.C. 938, 954-956 (1982). Mr. and Mrs. Steinberg contend that the decision in United States v. Cartwright,supra, requires that Mr. Steinberg be considered the willing seller. In our view, no such result is required under the holding of the Supreme Court in United States v. Cartwright. In the case before the Supreme Court, no private party holding mutual fund shares could reasonably have expected to receive the same amount which the funds selling such shares would collect from investors. The sole relevant market for a private party selling shares was that offered by the fund, which would repurchase the shares less a load or commission charge. Accordingly, we hold that in valuing the shares, Mr. Steinberg is not to be considered as the willing seller. In our view, any introduction of such a subjective consideration into the willing buyer, willing seller test would unduly complicate the task of administering and applying various provisions of the Internal Revenue Code. Propstra v. United States,supra at 1251-1252; Estate of Robinson v. Commissioner,69 T.C. 222, 225 (1977). *329 A particular actual seller may be able to realize less or more than the value determined under the objective willing buyer, willing seller test for various reasons. This, however, has never been considered to affect the determination of fair market value under the willing buyer, willing seller concept. The stock received by Mr. Steinberg was unregistered stock subject to an investment letter restriction. Section 83 provides that the fair market value of the property shall be determined without regard to any restriction other than a restriction which by its terms will never lapse. Mr. and Mrs. Steinberg argue, however, that since the restrictions here in issue are imposed under the securities law, rather than contractually, they are not restrictions within the meaning of the term as used in section 83. Mr. and Mrs. Steinberg contend that Congress did not intend, in enacting section 83, to have restrictions which are imposed by the securities law ignored in valuing stock. Mr. and Mrs. Steinberg acknowledge that this Court has held expressly to the contrary in Pledger v. Commissioner,71 T.C. 618 (1979), *330 affd. 641 F.2d 287 (5th Cir. 1981), but ask us to reconsider the position taken in that case. The statute uses the language "determined without regard to any restriction other than a restriction which by its terms will never lapse." The use of the word "any" in the statute indicates that Congress did not draw a distinction between those restrictions which were imposed pursuant to the Federal securities laws and those contractually imposed by private parties. Pledger v. Commissioner,supra, 641 F.2d at 293-294 and 71 T.C. at 628-629. Moreover, we would note, Mr. Steinberg under his agreement with Mr. Pulte and Pulte Homes had the right to require the corporation to register the shares beginning in April of 1972. Mr. Steinberg apparently exercised this right since Pulte Homes filed a registration statement in 1974 or 1975 to permit him to sell his shares. Obviously, Mr. Steinberg in his negotiations had bargained for such registration rights. The Steinbergs and respondent agree that the value of the shares and warrant otherwise determined should be discounted for "blockage." [26] See section 20.2031-2(e), Estate Tax Regs. They *331 do not agree as to the amount of the discount. At trial, the testimony of several expert witnesses was offered. Each of two experts testified that in his opinion a discount of between 25 and 30 percent should be made for blockage since the number of shares available for public trading or "the float" was only 200,000 shares, so that a sale of a block of an additional 81,000 or 91,000 shares could not be accomplished without depressing the market, regardless of whether the shares were sold in a single block or in smaller lots over a period of time. One of the experts stated, however, that if his firm had been successfully able to drum up sufficient orders, the discount at which it would have purchased the block of shares would have been less than 25 percent. However, this expert stated that it would be difficult to give an opinion as to the precise amount of the discount under the circumstances since time would be needed to drum up interest in the shares. He stated that the discount at which his firm would purchase the shares, after having developed an interest in them, would be at least 10 percent. *332 The Steinbergs argue, on the basis of the experts' testimony, for a discount of 30 percent and respondent for a discount of 12-1/2 percent. In our view, the proper discount must be determined with consideration of the starting price which is being discounted. Mr. Steinberg argues that the National Quotation Bureau's quoted prices should not be used as a starting point since they did not represent actual sales. He argues that the price of $7.50 per share of common established for conversion of the preferred shares into common shares is a better indication of value for small quantities of stock. However, the experts called by the Steinbergs used the National Quotation Bureau's quotation as their starting price, recognizing that this quotation did not necessarily represent actual sales and was for small amounts, probably 100 shares of stock. Certainly, the situation of Pulte Homes had changed substantially between the time the preferred shares were sold and March 24, 1971. Also, the preferred stock carried a dividend rate of 10 percent, which was high for the time, and it may well be the conversion price was set at the amount it was as a further inducement to sell the preferred. *333 All the experts used as a beginning point the National Quotation Bureau's quotation, and we accept their opinion in this respect. However, in our view, because of the small number of shares involved in these quotations, we accept the discount of 25 to 30 percent used by the experts and find that the National Quotation Bureau's quoted price should be discounted by 27-1/2 percent.
Where no actual sales are available during a reasonable period beginning before and ending after the relevant valuation date, the fair market value for the shares is to be determined by taking the mean between bid and asked prices. See section 20.2031-2(c), Estate Tax Regs. We find that the 81,000 shares had a value, as determined under section 83, of $12.144 per share on March 24, 1971, which is derived by taking the mean between the average of the bid prices and the average of the asked prices quoted by the National Quotations Bureau (16.75), less a discount of 27-1/2 percent for blockage. The warrant on the April 7, 1971, exercise date, we find, had a value as determined under section 83 of $108,610, which *334 is derived from the $15.125 per share mean between the quoted bid and asked prices for Pulte Homes common that day, less a 27-1/2 percent discount for blockage and less a further $ .10 per share for the price required to exercise the warrant. Decision will be entered under Rule 155 in docket No. 11852-77.
Decision will be entered for the respondent in docket No. 11859-77.
Footnotes
1. The deficiencies for the years here in issue resulted from a decrease in the net operating loss of the parent company, Pulte Home Corporation, for the year 1971 and the resulting reduction in its not operating loss carryback to it and its subsidiaries. ↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. The term "Pulte Homes" as sometimes hereinafter used refers not only to Pulte Home Corporation but at times encompasses it and the other corporations affiliated with it through which Mr. Pulte carried on homebuilding business operations.↩
a. Notes payable represented by demand notes under $3 million revolving credit arrangement between Pulte Homes and local Detroit bank. ↩
b. $14,261,607 of mortgages, notes and land contracts payable had interest rates ranging from 4 percent to 14 percent per annum and were collateralized by inventories and certain fixed assets. Certain of these borrowings had been personally guaranteed by Mr. Pulte. ↩
c. 7,500 shares of preferred were purchased by Mr. Steinberg and Mr. Steinberg's father for $750,000 pursuant to a purchase agreement as part of a financing service agreement entered into between Mr. Steinberg, Mr. Pulte and Pulte Homes, all of which is discussed infra.↩
4. It was further specified that this preferred stock would have the following rights, preferences and privileges: (1) The stock would not entitle the holder to voting rights; (2) the stock would be convertible at any time into Pulte Homes common stock, $1 par value, at a conversion price of $7.50 per share; (3) the stock would be without par value and have preferential rights, upon liquidation, over the Pulte Homes common stock in the amount of $100 per share; (4) the holder of the stock would be entitled to annual cash dividends of $10 per share payable semiannually (such annual cash dividends under specific circumstances would be reduced to $6 per share); and (5) the stock would be callable after December 31, 1971, at the option of Pulte Homes at a price of $107.50 per share for the first year thereafter and declining on a proportionate basis to $100 per share in the fifth year thereafter. Additionally, the holders of the common stock of Pulte Homes obtained in exchange for the preferred stock would have certain rights with respect to a registration of such common stock under the Securities and Exchange Act of 1933. ↩
5. Such debt securities would be subordinated to all other indebtedness of Pulte Homes for borrowed money and to any obligations incurred by Pulte Homes in connection with its purchase of land. The debt securities would provide for interest on the principal amount at the rate of 11 percent per annum, payable semiannually, and were to have a due date of not less than 7 years after the date of issue. Pulte Homes additionally would issue to each purchaser, for each $20 principal amount of such debt securities, a warrant exercisable at any time wihin 7 years after the date of issue to purchase one share of Pulte Homes common stock, $1 par value, at a purchase price of $10 per share. These warrants were to have the same terms, conditions, rights and privileges as the common stock purchase warrants granted to Gateway by Pulte Homes pursuant to the third stage of the raising of capital by Gateway for Pulte Homes which are described infra.↩
6. Consummation of all of the purchases described in the three stages of the raising of capital for Pulte Homes was to be subject to proper authorization by Pulte Homes and by the appropriate State, Federal and local regulatory authorities and in compliance with all laws and regulations. Further, all written commitments were to be executed by persons or entities who intended to acquire Pulte Homes securities for their own account, and the issuance by Pulte Homes of its securities would be in a manner which in the opinion of Pulte Homes' counsel would be exempt from registration under the private offering provisions of the Securities and Exchange Act of 1933.↩
7. These debt securities had the same provisions for subordination, interest rate and payments, and sinking fund as specified for the debt securities in the draft agreement with Gateway. Also, the purchasers of the debt securities would similarly receive warrants entitling them to purchase Pulte Homes common and certain registration rights. See n. 5, supra.↩
8. In the agreement, it was further provided that Mr. Steinberg and his assigns would have the same registration rights with respect to these 30,000 shares as provided with respect to the shares underlying the warrants to be issued pursuant to paragraph 3(d) of the agreement, which is discussed hereinafter. ↩
9. Mr. Pulte further agreed that upon delivery of this warrant he would deposit with the First Jersey National Bank, as escrow agent, the number of shares called for upon exercise or partial exercise of the warrant. Such shares deposited were to be free and clear of all liens, claims and encumbrances, and were to be fully paid and nonassessable.↩
10. In a subsequent agreement dated March 17, 1971, but executed in June of 1972, Mr. Steinberg agreed to indemnify Mr. Pulte to the extent of $2.50 per share with respect to any tax liability incurred by Mr. Pulte from his transfer of 89,000 shares to Mr. Steinberg, which transfer was stated to be agreed to and contemplated as of the date of the agreement. The discrepancy between the stated number of shares to be transferred to Mr. Steinberg and the number of shares actually transferred to him in 1971 is not explained.↩
11. The draft of the proposed agreement between Gateway, Pulte Homes and Mr. Pulte covered only the shares and warrants which Gateway itself would receive. Mr. Pulte and Mr. Grosfeld had previously agreed that, in return for his services in assisting with the several financing transactions and as a finder's fee, Mr. Grosfeld would receive a certain specified number of shares or warrants from Mr. Pulte directly. Mr. Grosfeld at trial testified that Mr. Pulte subsequently wanted to have a direct written agreement solely with Mr. Steinberg, with Mr. Steinberg being responsible for compensating Mr. Grosfeld.↩
12. These 30,000 common shares are not the subject of controversy in this case.↩
13. The Financing Services Agreement executed on December 31, 1970, apparently did not require pro rata payment for partial performance. As will be discussed infra,↩ Mr. Steinberg subsequently received warrants to purchase from Mr. Pulte 30,000 common shares of Pulte Homes at 10 cents per share.Mr. Steinberg transferred warrants for the purchase of 20,000 of the shares to Mr. Grosfeld.
14. On brief, Pulte Homes asks this Court to reconsider its prior ruling that respondent is not barred from raising the capital expenditure issue. In a pretrial motion, Pulte Homes sought to prevent respondent from raising this issue because of an alleged agreement between counsel for respondent and counsel for Pulte Homes that the issue would not be raised in return for Pulte Homes' consenting to have the trial in the instant case take place in New York City. After holding a hearing, this Court on December 19, 1979, entered an order denying the motion. The Special Trial Judge who presided at the hearing determined that there was simply no agreement, that there at most had been discussions between counsel for respondent and counsel for Pulte Homes regarding the merits of the legal issues in the case. We, therefore, decline to reconsider this matter.↩
15. As we have stated in our findings, Mr. Pulte transferred the stock to Mr. Steinberg. However, respondent has made no contention that for this reason Pulte Home is not entitled to deduct the fair market value of the stock to the extent that the services rendered by Mr. Steinberg to Pulte Homes for which the stock was transferred were such that payment therefore would be a deductible ordinary and necessary business expense. See sec. 1.83-6(d), Income Tax Regs. We therefore have no issue as to whether the transfer by Mr. Pulte should result in a deduction for Pulte Homes or the validity of sec. 1.83-6(d), Income Tax Regs.↩
16. We would further note that Pulte Homes has not claimed a deduction with respect to the 10,000 shares underlying the warrant transferred to Mr. Steinberg by Mr. Pulte. Mr. Steinberg's right to receive such warrant had accrued prior to the time the parties executed the amendment to the Financing Services Agreement.↩
17. The pertinent paragraphs of this letter are as follows: I am deeply appreciative of the interest which you have taken in the company and have transferred these shares in the expectation of, and consideration of your continued involvement with and your consulting, financial and other services to the company and your agreement to be nominated to the Board of Directors of the company, all of which I believe will be beneficial to the company and to all of its shareholders. But, I wish to reiterate, again, as I will to Jimmy, that the transfer is as an incentive and is not in consideration of any specific or particular services.↩
18. Mr. Steinberg testified that the statements made in the April 26, 1971, letter from Mr. Pulte that the enclosed stock certificates were only an incentive in connection with his becoming involved in the company and his agreeing to become a director of Pulte Homes and not in consideration of any specific or particular services, were untrue. Mr. Steinberg, on further examination, admitted that his attorneys had wanted these statements made in the letter in order to avoid any appearance that by receiving the shares he had usurped a corporate opportunity or breached his fiduciary duty as an officer of Reliance Group, Inc. We have carefully considered Mr. Steinberg's testimony, as well as the other evidence of record, and find his testimony that the shares primarily were to pay for his helping arrange the public offering to be credible. The April 26, 1971, letter, it is to be noted, was sent and obviously drafted a significant length of time after the parties had already agreed Mr. Steinberg would receive the 81,000 shares. ↩
19. Mr. Grosfeld, on examination by counsel for Pulte Homes, gave the following testimony concerning the events surrounding the execution of the amendment to the Financing Services Agreement: A. We still wanted our shares and I think at this time Bill felt that he wanted to go with us. We felt, we approached Bill and I remember---let me back up. I do not know where the dinner was held. Bill testified that it was in Detroit, but I remembered that I talked to Bill about it a great deal and then Saul, Bill and I had dinner. Bill had to get over a hurdle and the hurdle was that he had to make the bet that we were going to stick around and that hurdle, I'm sure that when we faced this issue I think it's clear that it was after initial discussions or contract had been made with either Dean Witter or Towbin. * * * Q. [by the Court] Do you think this dinner was after-- Q. [by counsel for Pulte Homes] When was-- A. Yes, I think this dinner was after discussions existed between Dean Witter, I mean-- Q. * * * was it after the amendment to terminate the financing agreement had been executed? A. Was it after the amendment--I don't remember. Q. All right, at this point what was the nature of your discussion * * * with Mr. Pulte about receiving additional shares from Mr. Pulte? A. We wanted Bill to give us the shares the way he gave us the shares. We asked him to take a bet. We told him he had to take the bet. Q. What was he getting from you? A. The promise that we would be involved and help him on a long-term basis with the company. * * * Q. [by counsel for Pulte Homes] Were the discussions about the effects of specific underwriters on the compensation? A. No. Q. When you say Mr. Pulte was asked to make a bet what did you mean * * *.
A. Can I change my testimony--I don't remember all the details of what was said at the dinner or during my discussions with Bill.I am sure that Bill was not unimpressed that we were, that he was having discussions with Unterberg, Towbin. Mr. Pulte, although denying that the transfer of the 81,000 shares was to pay for Mr. Steinberg's help in arranging the subsequent public offering, had earlier in his testimony stated as follows: Q. [The Court] Do I understand you to say that Bob Towbin was in the picture by the time, March 9, by the time the second agreement was entered? A. Yes. Q. [by counsel for Pulte Homes] Were there other underwriters also in this picture at this time? A. Well I know that they had, when I say they I mean Jim Grosfeld and Saul Steinberg had talked to a couple others, but I think at that time and again that's a long time back, that Bobby Towbin had services probably in the way we were going to go. It was my understanding that this other agreement was dead, but they just wanted to clearly make sure that it was dead.↩
20. Pulte Homes contends solely that the entire expenditure was deductible. Even if the transfer of the 81,000 shares was to compensate Mr. Steinberg for other additional services which were of a deductible nature, Pulte Homes has on this record not established any basis for making an allocation of the value of the shares. See Rule 142(a), Tax Court Rules of Practice and Procedure.↩ Although Mr. Pulte testified that Mr. Steinberg had given him other valuable general business advice, such as suggesting Pulte Homes retain a bigger law firm to serve as its counsel and retain a Big 8 accounting firm to do its books, we do not consider Mr. Steinberg's giving of such advice to be more than an incidental part, at most, of the agreement. On cross-examination, Mr. Pulte could not recall when Mr. Steinberg gave him such advice. Mr. Pulte could not say whether such advice was given prior to or after the amendment to the Financing Services Agreement had been executed, prior to or after his transferring the 81,000 shares to Mr. Steinberg or, for that matter, prior to or after Mr. Steinberg became a director of Pulte Homes on June 3, 1971. We would further note that respondent has recognized that the transfer, in part, was in fact for services other than raising of capital by allowing a deduction of $227,500 of the transfer to Pulte Homes.
21. This legislative history, in pertinent part, is as follows: The committee provided rules for the employer's deduction for restricted property given to employees as compensation. The allowable deduction is the amount which the employee is required to recognize as income. The deduction is to be allowed in the employer's accounting period which includes the close of the taxable year in which the employee recognizes the income. Where restricted property is not subject to the new rules governing recognition of income, existing rules regarding the amount of the deduction will continue to apply.↩
22. Sec. 1.83-6(a)(1) and (4), Income Tax Regs. provide in part as follows: Sec. 1.83-6. Deduction by employer. (a) Allowance of deduction--(1) General rule. In the case of a transfer of property in connection with the performance of services, or a compensatory cancellation of a nonlapse restriction described in section 83(d) and sec. 1.83-5, a deduction is allowable under sections 162 or 212, to the person for whom such services were performed. The amount of the deduction is equal to the amount includible as compensation in the gross income of the service provider, under section 83(a), (b), or (d)(2), but only to the extend such amount meets the requirements of sections 162 or 212 and the regulations thereunder. Such deduction shall be allowed only for the taxable year of such person in which or with which ends the taxable year of the service provider in which such amount is includible as compensation. For purposes of this paragraph, any amount excluded from gross income under section 79 or section 101(b) or subchapter N shall be considered to have been includible in gross income. * * * (4) Capital expenditure, etc. No deduction is allowed under section 83(h) to the extent that the transfer of property constitutes a capital expenditure, an item of deferred expense, or an amount properly includible in the value of inventory items. In the case of a capital expenditure, for example, the basis of the property to which such capital expenditure relates shall be increased at the same time and to the same extent as any amount includible in the employee's gross income in respect of such transfer. Thus, for example, no deduction is allowed to a corporation in respect of a transfer of its stock to a promoter upon its organization, notwithstanding that such promoter must include the value of such stock in his gross income in accordance with the rules under section 83↩.
23. There is no dispute between the parties that the 81,000 shares received by Mr. Steinberg from Mr. Pulte are to be valued as of March 24, 1971. The parties have stipulated that on such date Mr. Pulte transferred the shares to Mr. Steinberg. Mr. Steinberg did not actually receive the stock certificates representing such shares until late April; however, Mr. Pulte, on March 24, 1971, had apparently transferred the 81,000 shares to Mr. Steinberg's name with the company's transfer agent.↩
24. Sec. 83(a) provides as follows: SEC. 83. PROPERTY TRANSFERRED IN CONNECTION WITH PERFORMANCE OF SERVICES. (a) General Rule.--If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of-- (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over (2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.↩
25. Since neither Mr. and Mrs. Steinberg nor respondent contend that section 83 is to apply on March 25, 1971, the date when he received the warrant and was granted the option, we need not reach the issue of whether the warrant on such date had an ascertainable fair market value. We would note that even if we agreed with the Steinbergs' contention that the warrant had a value equal to the value of the underlying shares (but see sec. 1.83-7(b)(2)(iv)↩ and -7(b)(3), Income Tax Regs., which provides that the value of an option privilege, in the case of an option to buy, includes the opportunity to benefit from any future increase in the value of the property subject to the option without the risk of capital, and is not merely the difference that may exist at any time between the option price and the value of the property subject to the option), the value of the warrant on March 25, 1971, would be higher than the value determined as of April 7, 1971. The quoted bid and asked prices for Pulte Homes common stock were higher on March 25, 1971, than on April 7, 1971.
26. Pulte Homes argues that no blockage discount should be allowed but gives no basis for its contention. The expert witness who testified for Pulte Homes gave an opinion that no discount should be allowed, yet admitted on cross-examination that his brokerage firm in purchasing a similar block of shares would purchase them at a discount. In light of this and other inadequacies in this witness's testimony, we give his opinion little weight.↩